## Appendix

United States of America,
Plaintiff–Appellant,

v.

William Dennis Danielson,
Defendant–Appellee.

Nos. 01–30151, 01–30176.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 2002.

Filed March 24, 2003.

Amended May 19, 2003.

UNITED STATES of America,
Plaintiff–Appellee,

v.

William Dennis DANIELSON,
Defendant–Appellant.

Bryan E. Lessley, Office of the Federal Public Defender, Eugene, OR, for the defendant-appellant-appellee.

Jeffrey A. Kent, Office of the United States Attorney, Eugene OR, for the plaintiff-appellee-appellant.

Before GOODWIN, T.G. NELSON and W. FLETCHER, Circuit Judges.

**OPINION**

WILLIAM A. FLETCHER, Circuit Judge.

In this hotly contested case, William Dennis Danielson was convicted of illegally selling and transporting in interstate commerce a deer taken without a state-issued tag in violation of the Lacey Act, 16 U.S.C. §§ 3372(a)(2)(A) and 3372(c). Danielson appeals his conviction on the ground that the government violated his Sixth Amendment right to counsel.

The prosecution team in this case deliberately and affirmatively took steps, while Danielson was represented by counsel, that resulted in the prosecution team's obtaining privileged information about Danielson's trial strategy. Members of the prosecution team wrote and retained memoranda containing privileged trial strategy information, as well as recorded, listened to, transcribed, and retained the tapes and transcripts containing the privileged information. In addition, the Assistant United States Attorney in charge of the prosecution retained in his private office memoranda and unredacted transcripts containing the privileged information. None of this material was produced to Danielson or his counsel during pre-trial discovery.

The government's interference with Danielson's attorney-client relationship was neither accidental nor unavoidable, but was rather the result of deliberate and affirmative acts. We therefore hold that if there was prejudice there was a violation of the Sixth Amendment under *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). For a determination of prejudice, we rely on *United States v. Mastroianni*, 749 F.2d 900 (1st Cir. 1984), and *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), to hold that the government has the "heavy burden" of proving non-use of Danielson's trial strategy information. We remand to the district court for an evidentia-ry hearing for a determination of prejudice under this standard.

We affirm the district court on all other issues.

**I. Background**

At times relevant to this suit, Danielson operated a hunting guide service in Medford, Oregon. On March 18, 1999, Danielson and five co-defendants were indicted in Oregon district court for violating the Lacey Act. Count One charged Danielson and others, including co-defendant Robert Howard, with illegal sale in interstate commerce of "numerous sets of deer and elk antlers." Count Two charged Danielson with the sale of an illegally taken deer to a hunting client, Billy Lingefelt, and interstate transportation of that deer. Count Three charged Danielson and one of his guides, John McCollum, with sale to a different hunting client, and with accompanying interstate transportation, of two illegally killed deer. The indictment contained six additional counts pertaining to other defendants. Assistant United States Attorney ("AUSA") Jeffrey Kent was in charge of the prosecution for the government. Bryan Lessley, a Federal Public Defender, represented Danielson.

At trial, Danielson's defense to Count One was that he had leased rather than sold the deer and elk antlers in question. Danielson's defense to Count Three was that while it was true that the client in question did not have state-issued tags that would have permitted him to kill deer, Danielson had given specific instructions that the client could not hunt. If anything illegal had been done, it had been done by McCollum or someone else, without Danielson's knowledge. The jury acquitted Danielson on Counts One and Three.

The jury returned a guilty verdict on Count Two. According to the government's evidence at trial, Billy Lingefelt had trav-

eled to Oregon from South Carolina to take part in a combined elk and deer hunt, for which he had agreed to pay Danielson a total of $7000. Lingefelt shot a deer on the second day of the deer portion of the hunt while being guided by one of Danielson's employees, Austin Hall. The wounded deer escaped, and Lingefelt and Hall were unable to locate it. Danielson and Hall guided Lingefelt the next day, when Lingefelt shot and killed another deer. That evening, Hall found the deer that Lingefelt had shot the previous day. Even though Lingefelt had a state-issued tag that permitted him to kill only one deer, Danielson told him that he could keep both deer if he paid Danielson an extra $2500. The district court sentenced Danielson to eighteen months in prison based on the guilty verdict on Count Two.

Before trial but after indictment and appointment of counsel, Wayne Sava, a tenant on Danielson's Oregon property, contacted the Oregon State Police. During his initial meeting with the police, Sava told them he had had a conversation with Danielson in which Danielson had told Sava that he might have to ask Sava to "say [he] saw something [he] didn't." Acting in coordination with AUSA Kent, the police encouraged Sava to continue his conversations with Danielson. They agreed to pay some of Sava's expenses, including his rent, while he gathered information.

At Sava's initial meeting with the police, on December 8, 1999, he was asked what he had already learned from Danielson. Oregon Sr. State Trooper David Owren, who is described by Kent in a post-trial affidavit in the district court as "the primary law enforcement officer in this case," summarized in a December 14 memorandum what Sava said. A checked box at the top of the cover sheet indicates that the memorandum was routed to Kent. The memorandum states, among other things,

that Sava had learned that Danielson would rely, as part of his defense strategy, on the existence of a lease agreement (rather than a sale) for the deer and elk antlers: "Sava said that Danielson is always talking about the case that is currently against him saying that the cops don't have anything and that he had a lease agreement.... Danielson said that he had leased the antlers...." The purported lease agreement was the defense used to Count One of the indictment.

On December 22, 1999, Sava tape recorded a telephone conversation with Danielson. In a January 5, 2000 memorandum, Owren summarized the substance of the conversation. According to the cover sheet, this memorandum also was routed to Kent. The memorandum included the following:

> Danielson said they got the horn situation. "Did I lease them? Yes I did. What do they got? They got nothing." Danielson said that he leased the antlers, and did not sell them.... Danielson said that if he told the guy up front that he could not sell them, but that it was legal to lease them, there's no problem. Danielson said that was what he's going to prove.
>
> ... Danielson said that there was no one in the room that witnessed the lease to Howard. Danielson said that it was just Howard and himself and that it was Howard's word against Danielson's.

Howard was a co-defendant with Danielson in Count One. This part of the conversation elaborates what Danielson had previously revealed to Sava, in a shorter version, about his trial strategy as to Count One: He was going to claim at trial that he leased rather than sold the antlers in question. The memorandum stated further:

> Danielson said that John McCollum already pled guilty and that they (the

government) were going to try and prove that he (Danielson) aided and abetted them. Danielson said that they got nothing.

McCollum was a co-defendant in Count Three. Danielson's defense to Count Three at trial, consistent with the memorandum, was that he had told McCollum that the clients without a tag could not hunt, and that if anything illegal had been done, it had been done by McCollum or another guide without his knowledge.

On January 13, 2000, Sava tape recorded another telephone conversation with Danielson. Owren sent a partial transcript to Kent on February 14, describing it in his cover memorandum as "transcribed excerpts of the conversation regarding Danielson talking about the upcoming trial." Danielson states several times in the transcript that he does not intend to plead guilty, and that he will rely on the government's obligation to prove its case beyond a reasonable doubt. More specifically, in an apparent reference to Count Three, Danielson indicates that he intends to blame someone else for any illegal acts: "[S]omebody that worked for me does something wrong and they want me to pay the price."

Finally, on January 22, 2000, Sava wore a body wire and recorded a lengthy conversation with Danielson. Owren forwarded the complete transcript to Kent on February 8. In this conversation, Sava questioned Danielson about his trial strategy, and Danielson discussed at length his trial strategy for Count Two (the count on which he was ultimately convicted). Danielson first indicated that he intended to testify at trial:

> Sava: Are you going to have time to talk [at trial]?
>
> Danielson: Well, yeah, I'm gonna go to the stand. I mean I'm not gonna be an O.J. Simpson and not say nothing.

Danielson then went on to say that there is no proof that the first deer was ever found. He would say at trial that another deer was found later, but that it was not the deer that had been shot on the second day of the hunt:

> I mean if he says I shot at a deer.... It got away. Five days later, somebody shows up with a deer but it's still, the blood is still warm. Well, why would the blood be warm in five days? It wouldn't be, right? ... When I say that, that the deer was still warm, the blood was warm and then ... then becomes doubt in that situation that that was that guy's deer that he shot at five days ago.

Danielson and Sava then discussed at length Danielson's defense to the government's contention that he charged Lingefelt $2500 for the head of the deer that had been shot on the second day but not found until the evening of the third day:

> Danielson: So now [Lingefelt's] word is that he paid for the deer head. Why did he give you twenty-five hundred? ... Because he paid for his wife. That's what my statement will be. I made him pay me for his wife.... Because then they have to believe either what he says or [what] I say ... and it's a hung jury....
>
> Sava: Do you know what [Lingefelt] is going to say on the stand?
>
> Danielson: He's going to say that I made him pay for that deer. But what I'm saying is [would the jury] believe that [Lingefelt's] wife was a paid non-hunter at a hundred dollars a day? Wouldn't you expect somebody to charge you if you

brought your wife on a hunt?

Sava: Is that the standard procedure in the hunting business?

Danielson: Yes.

Sava: And have you charged other women to go on the hunt, other non-hunters before?

Danielson: Uh huh. Well, that will be ... his word against my word. He says he paid for the deer head. I say I made him pay for his wife. There was a misunderstanding. You gonna put me in prison for a misunderstanding?

Sava: How did the [hunting] contract read? ...

Danielson: Well, the contract reads that he paid for the hunt and that he paid me an extra twenty-five hundred dollars. [I]t says a hundred dollars a day for his wife....

Sava: What does his wife say? You don't know?

Danielson: She won't be testifying as far as I know.

At the end of the conversation, Sava asked about a letter Danielson had written to his attorney:

Sava: How did the letter go over with your attorney? The one I read.

Danielson: Oh, he thought it was very well written and he said, you know, those are the points that he wants to go over with me.

In his affidavit in the district court, AUSA Kent states that he and the police were seeking to use Sava to gather evidence of new crimes by Danielson—such as subornation of perjury and bribery—rather than information relevant to Danielson's trial strategy in the case already filed against him. Kent describes a meeting

with Sava on an unspecified date in December. He states that at that meeting he advised Sava that "because of certain rules of law, I did not want to be advised of any information other than new and separate criminal conduct such as obstruction of justice," and that Sava "should not solicit trial strategy information from Danielson." In addition:

I further explained that if Danielson continued to obsessively volunteer such information on his own, that to protect his cover and cooperation he could continue to receive that information but that I did not want to be advised of these matters—unless, of course, the strategy included illegal activities such as subornation of perjury.

Kent does not state in his affidavit that he instructed Owren or other police officers involved in Danielson's prosecution that they should avoid learning about Danielson's privileged trial strategy, or that they should instruct Sava not to report privileged information to them.

Some of the information revealed by Sava in his initial meeting with police on December 8, 1999, involved trial strategy relevant to Count One. Prior to this meeting, Sava was not acting on behalf of the government. Because this was the first meeting, it is clear that Sava had, at this point, not been advised to avoid asking questions about trial strategy. However, according to Kent's memorandum, Sava had been so advised in his December meeting with Kent. Sava nevertheless gathered, and reported, a great deal of information about Danielson's trial strategy, both after his initial December 8 meeting with police and after his December meeting with Kent. In his December 22 conversation with Danielson (which may or may not have been after the meeting with Kent), Sava learned a great deal about Danielson's plan to rely on the lease agree-

ment strategy to defend against Count One. In his January 13 conversation (which clearly was after the meeting with Kent), he learned that Danielson intended to go to trial, and that he intended to blame "somebody that worked for me." In his January 22 conversation, Sava specifically asked Danielson whether he would take the stand at trial; asked in detail, in relation to Count Two, about Danielson's plan to argue that Lingefelt had paid the extra $2,500 for his wife to come on the hunt rather than for the second deer; and asked about a letter Danielson had written to his attorney concerning trial strategy.

It is obvious from the foregoing that Trooper Owren, "the primary law enforcement officer in this case," and other police officers in the case were not insulated from privileged trial strategy information gathered by Sava. However, Kent states that he was insulated, at least to some degree, from that information. According to Kent's affidavit in the district court:

> I consistently told law enforcement officials that insofar as information relating to lawful defense trial strategies might be developed incidental to their efforts to investigate obstruction of justice issues, I did *not* want to be advised of such matters. I told them that as to undercover recordings, I only wanted to be told about and listen to portions relating to obstruction of justice matters— and any other criminal conduct separate and independent of the pending charges.
>
> . . . .
>
> Government counsel was not advised by the law enforcement officers or Wayne Sava of any *lawful* trial strategy issues. Government counsel in fact did not review the transcripts, tapes or reports relating to Wayne Sava's cooperation—except when specifically directed by the officers or Wayne to portions relating to new and independent criminal conduct. When Wayne Sava came

to our offices in April, 2000 to be prepared to testify in rebuttal at trial, I asked him to independently listen to the tapes, read the transcripts, and review the reports—and to advise me only of the parts that fit the parameters above.

(Emphasis in original.)

Kent provided elaboration at a post-trial hearing in response to prodding by Danielson's attorney, Lessley, and by the district court:

> Lessley: I'm not making personal attacks. I'm trying to clarify what the record shows and what it doesn't show. . . .
>
> It is apparent from these exhibits that all of . . . [Sava's] recordings were provided to the case agents, including the extensive discussions that I have described about the upcoming trial.
>
> It is also apparent from these reports and from . . . the little box that says copy to AUSA Jeff Kent, that the prosecutor was being copied on all of this information, and that none of it was being withheld from him. . . .
>
> And so there appears to have been no effort at all by the agents to in any way insulate the prosecutor from receiving the information.
>
> It seems that the insulation claim made by the government isn't that the prosecutor was somehow shielded from receiving the information. It's that once he received it and it was on his desk, he did not read it except for portions that were pointed out to him by the case agents.
>
> I told Mr. Kent on Monday that if that's his representation, that then perhaps a lot of the discord may have been avoided by having a better understanding between us.

The Court: Is that the understanding of the discussion on Monday? It that the posture that's taken today?

Kent: I stand by my affidavit, Your Honor, so.

The Court: A simple yes or no.

Kent: I'm not sure I understand the question.

The Court: [I]t's clear in looking at all the documents that in his conversations with you that you were checked or given copies of absolutely everything, and that you acknowledge receiving everything and having it on your desk, but you read only those portions that were called to your attention related to the issues of concern as specified more directly in your affidavit.

Mr. Kent: Yes, with this one modification: That they weren't on my desk. I mean, I received them. I threw them in a file called the Wayne Sava file, and I stuck them in a drawer.

At oral argument in this court, in response to questioning, Kent provided further elaboration:

Kent: I filed an affidavit in this case in which I swore under oath, uncontested, that I did not look at any of that material other than material that was specified as new crime evidence by officers.

The Court: [L]et me ask you to expand in a little more detail. How was that segregated out? Was it sort of highlighted—"read this"—but if it wasn't highlighted you weren't supposed to read further?

Kent: No, the way it was done was the officers would go to portions of the audio tape that related to the independent evidence, whether it be obstruction or some other new crime that Mr. Danielson was contemplating. They would allow me to listen to that portion of the tape and would direct me to that portion of the transcripts. The transcripts that came into my office were filed away and were never looked at until this case was concluded.

The Court: And when you say direct your attention to that portion of the transcript you would then read that portion of the transcript?

Kent: Just those portions, correct.

The Court: And would you have on your desk, when you read those portions would you have the full transcript?

Kent: No, I did not.

The Court: That is to say, you had a redacted transcript?

Kent: They would direct me to just the portions of the transcript.

The Court: No, I'm asking a different question. Did you have on your desk a redacted transcript that had in typewriting only those portions of the transcript that you had listened to on the tape?

Kent: It wasn't in my office. It was actually, we met in a conference room.

The Court: Wherever this was.

Kent: Yes, and yes. I dealt with redacted transcripts.

The Court: That is to say you never had a page in front that had on it any typewriting that was material that you weren't supposed to have your attention directed to?

Kent: Correct.

Until oral argument before this court, Kent had never mentioned redacted transcripts. The district court record contains no redacted transcripts.

During pretrial discovery, the government did not disclose the existence of the memoranda, tapes, or transcripts. Daniel-

son first learned of the tapes during the government's cross examination of Danielson on April 27, 2000. After Kent questioned Danielson about alleged attempts to influence witnesses, he asked Danielson, "[Y]ou'd do anything in this case to—to win, wouldn't you?" Danielson replied, "I'm not guilty." Kent then asked for a sidebar. The district court sent the jury out of the courtroom, whereupon Kent revealed that the government had Danielson "on tape talking about rigging this jury." Kent stated that, based on information in the tapes, he would establish that Danielson stated that he had bribed a grand jury witness and that he had instructed someone "on how to reach this jury." The court recalled the jury and allowed the government to continue its cross examination of Danielson. Danielson made no objection based on the Sixth Amendment at that time.

When the trial resumed the following morning, Danielson's attorney, Lessley, moved to suppress the statements elicited by Sava on the ground that they were obtained in violation of the Sixth Amendment. Lessley further moved for a mistrial, arguing that the government had violated its discovery obligations under Federal Rule of Criminal Procedure 16 by failing to disclose the taped conversations. Finally, he moved to suppress any information contained in the tape recordings based on the asserted violation of Rule 16. Lessley noted that he could not "elaborate on the full extent of the Sixth Amendment issues" without "knowing more of the origin, circumstances, duration, and full content of the communications between the informant and Mr. Danielson."

The district court held that Danielson had failed to make a timely Sixth Amendment objection because he had failed to object the previous day when the government first disclosed the existence of the tapes. It denied the motion for mistrial, but granted the motion to suppress for violation of Rule 16, preventing Kent from introducing additional information from the tapes during the remainder of the trial. Prior to closing arguments, which took place that day, the district court instructed the jury to disregard the previous day's "questions and answers regarding tapes, informants and alleged improprieties regarding the trial or witnesses."

After his conviction on Count Two, Danielson timely filed post-trial motions based on the Sixth Amendment and Rule 16. The district court denied Danielson's motions. It held that even if Danielson's rights under the Sixth Amendment had been violated, and despite the violation of Rule 16, the suppression of the evidence and the curative jury instruction sufficiently ameliorated any prejudice. Danielson timely appealed.

## II. Sixth Amendment Right to Counsel

### A. Standard of Review

■ The government argues that we should review the district court's decision for plain error because, in its view, Danielson waived his Sixth Amendment argument in the district court by failing to raise it on the day the existence of the tapes was revealed. We disagree. When Kent revealed the existence of the tapes in court on April 27, he did not reveal that the tapes contained privileged information. Indeed, the district court noted at that time, during the colloquy outside the presence of the jury, "I don't know what your tape has, what information," and then permitted Kent to cross-examine Danielson regarding the contents of the tapes. Danielson's attorney could not have known at that time that his client's Sixth Amendment rights might have been violated. The government turned the tapes and transcripts over to Danielson's attorney at the end of the day.

It was not until Danielson's attorney reviewed the tapes and transcripts that evening that he learned that Sava's questions, and Danielson's responses, were not limited to future crimes, but instead were directed in part to trial strategy. (It is not clear from the record before us precisely when Danielson's attorney learned about the memoranda prepared by Owren and forwarded to Kent; it is at least clear that he did not learn of them in court on April 27.) Danielson made his Sixth Amendment motion the next morning before trial resumed. Following his conviction, Danielson timely filed his post-trial motions based, *inter alia,* on an asserted violation of the Sixth Amendment. Under these circumstances, we find that Danielson raised his Sixth Amendment objection in a timely fashion. We therefore review the district court's decision *de novo. See United States v. Ortega,* 203 F.3d 675, 679 (9th Cir.2000).

### B. Sixth Amendment Violation

 The Sixth Amendment is meant to assure fairness in the adversary criminal process. *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Id.* at 655, 104 S.Ct. 2039 (quoting *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975)). Because this "very premise" is the foundation of the rights secured by the Sixth Amendment, where the Sixth Amendment is violated, "a serious risk of injustice infects the trial itself." *Id.* at 656, 104 S.Ct. 2039 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 343, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). The Supreme Court has instructed us to evaluate prosecutorial behavior based on its effect on the fairness of the trial. *See United States v. Agurs,*

427 U.S. 97, 110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). "As an officer of the court, the prosecutor has a heavy responsibility both to the court and to the defendant to conduct a fair trial. . . ." *United States v. Escalante,* 637 F.2d 1197, 1203 (9th Cir.1980). The Court has instructed us to be mindful of "whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *Strickland v. Washington,* 466 U.S. 668, 696, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). With these guiding principles in mind, we turn to Danielson's Sixth Amendment claim.

 Danielson's Sixth Amendment right to counsel attached when the government initiated adversarial proceedings against him. *See Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). At that point, Danielson had a right to rely on his counsel as a "medium" between himself and the government. *Id.* at 176, 106 S.Ct. 477. Danielson's Sixth Amendment right to counsel was offense-specific. *See McNeil v. Wisconsin,* 501 U.S. 171, 175, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991). That is, he had a right to counsel only on the offenses for which he had been indicted, and on any other offenses that constituted the "same offense" under the *Blockburger* test. *See Texas v. Cobb,* 532 U.S. 162, 167–73, 121 S.Ct. 1335, 149 L.Ed.2d 321 (2001); *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). The government's use of Sava to obtain Danielson's statements regarding separate offenses for which he had not been indicted, such as jury tampering and suborning perjury, was not an impermissible intrusion into the attorney-client privilege and therefore did not violate his Sixth Amendment rights. *See Cobb,* 532 U.S. at 173, 121 S.Ct. 1335.

■ The information sought and obtained by Sava, however, was not limited to information regarding separate offenses. The tape recordings of his conversations with Danielson contain discussions of Danielson's plan to testify in his own defense and of the trial strategy he was planning to employ on the indicted offenses. Government actions that deliberately elicit incriminating statements from an indicted defendant in the absence of counsel are improper under the Sixth Amendment. *See Moulton,* 474 U.S. at 176–80, 106 S.Ct. 477; *United States v. Henry,* 447 U.S. 264, 274, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); *Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Any statements so gathered must be excluded from the government's case-in-chief, although "they are admissible to impeach conflicting testimony by the defendants," provided the statements were voluntary. *See Michigan v. Harvey,* 494 U.S. 344, 349–53, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990). *See also, e.g., Ortega,* 203 F.3d at 681. The problem in this case, however, is not that the government obtained incriminating statements or other specific evidence, but rather that it obtained information about Danielson's trial strategy.

The centerpiece of our analysis must be *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). In *Weatherford,* plaintiff Bursey sued Weatherford, a law enforcement agent who had worked undercover on Bursey's criminal case, under 42 U.S.C. § 1983. Weatherford and Bursey had been arrested together after they jointly participated in vandalizing a Selective Service office. After the arrest, Weatherford continued to act as if he were one of Bursey's co-defendants. He even retained an attorney in order to continue "the masquerade." *Weatherford,* 429 U.S. at 547, 97 S.Ct. 837. Weatherford met twice with Bursey and his trial counsel, and Bursey and his counsel dis-

cussed trial strategy at those meetings. The district court specifically found that Weatherford had not sought to attend those meetings, but rather had been invited by Bursey and his counsel to do so. As the Supreme Court put it, Weatherford was invited "apparently not for his benefit but for the benefit of Bursey and his lawyer." *Id.* at 557, 97 S.Ct. 837. There was no indication that Weatherford initiated any topics of discussion or questioned Bursey regarding his trial strategy. The district court held that Bursey's Sixth Amendment rights had not been violated. The Fourth Circuit reversed, holding that "whenever the prosecution knowingly arranges or permits intrusion into the attorney-client relationship the right to counsel is sufficiently endangered to require reversal and a new trial." *Id.* at 549, 97 S.Ct. 837.

The Supreme Court rejected the Fourth Circuit's per se rule. But it also rejected a per se rule proposed by the state under which a defendant conversing with counsel in the presence of a third party would assume the risk that the third party may turn out to be a government informant. *Id.* at 554, 97 S.Ct. 837. Instead, the Court took a middle ground, holding that where "there was no purposeful intrusion by Weatherford," where there was "no communication of defense strategy to the prosecution," and where there was "no tainted evidence," there was no Sixth Amendment violation. *Id.* at 558, 97 S.Ct. 837.

In explaining its holding, the Court emphasized the awkward position in which Weatherford was placed when he was invited to participate in the meetings with Bursey and his counsel. At that time, Weatherford was still acting under cover, and, so far as Bursey knew, was a co-defendant in his criminal case. The Court noted that Bursey might therefore have

become suspicious if Weatherford had refused to attend the meetings. *Id.* at 557, 97 S.Ct. 837. Further, the Court emphasized that Weatherford kept the information he learned at the meetings entirely to himself: "At no time did Weatherford discuss with or pass on to his superiors or to the prosecuting attorney or any of the attorney's staff any details or information regarding [Bursey's] trial plans, strategy, or anything having to do with the criminal action pending against [Bursey]." *Id.* at 548, 97 S.Ct. 837 (internal quotation marks omitted). Finally, the Court emphasized that at the time Weatherford went to the meetings he did not expect to testify at trial. As it turned out, Weatherford's undercover status had been compromised by the time the trial took place, and on the day of trial the prosecutor decided to put him on the stand. *Id.* at 548–49, 97 S.Ct. 837. Because Weatherford and Bursey had vandalized the Selective Service office together, Weatherford was an eyewitness to Bursey's criminal acts. He testified only as to what he had seen; he did not testify as to what he had learned at the meetings.

This case is materially different from *Weatherford.* First, unlike in *Weatherford,* Sava "purposefully intru[ded]" himself into the attorney-client relationship. In *Weatherford,* Bursey and his counsel initiated the meetings and invited Weatherford to attend, and Weatherford would have jeopardized his undercover status by not attending. Further, there was no evidence that Weatherford had initiated conversation on privileged topics. By contrast, Sava initiated conversations with Danielson on privileged matters, and would have jeopardized nothing by not asking the questions that elicited the privileged information.

Further, when Sava first went to the police on December 8, he revealed what was unmistakably privileged trial strategy information when he said that Danielson intended to argue that he had leased rather than sold the deer and elk antlers. At the time he obtained this trial strategy information, Sava was not working on behalf of the government, and his acquisition of this information was not improper. Nor was it improper for the Oregon police to hear Sava's story on December 8. However, once the police learned on December 8 that Sava had obtained trial strategy information (and therefore knew that he might learn more such information in future conversations), the prosecution team was on notice of a potential Sixth Amendment violation if Sava, now acting on behalf of the government, continued to have conversations with Danielson. Kent states in his affidavit that he instructed Sava sometime in December "that he should not solicit trial strategy information from Danielson," but it is clear that Sava ignored whatever instruction he may have received. Moreover, there is nothing in the record to indicate that any such instruction was repeated after it became obvious that Sava was continuing to gather, and to report to the police, privileged information about trial strategy. Finally, it is clear that Sava was not merely a passive listener in his conversations with Danielson. Rather, he asked direct questions designed to elicit trial strategy. For example, in the January 22 conversation, Sava repeatedly asked direct questions about Danielson's plan to characterize the $2500 paid by Billy Lingefelt as payment for bringing his wife on the hunt. That part of Danielson's trial strategy was, of course, directed to Count Two, of which Danielson was convicted.

Second, in *Weatherford,* there was "no communication of defense strategy to the prosecution." *Id.* at 558, 97 S.Ct. 837. The Court was careful to note that at no time did Weatherford "discuss or pass on to his superiors or to the prosecuting attorney or any of the attorney's staff" any

of the privileged information he learned at the meetings. *Id.* Unlike Weatherford, Sava reported regularly and extensively to the police working with Kent what he had learned about Danielson's trial strategy. Trooper Owren, the "primary law enforcement officer in this case," then prepared and sent to Kent memoranda and transcripts containing the privileged trial strategy information that Sava had obtained.

It is clear from the foregoing that the government improperly interfered with Danielson's attorney-client relationship. The question of prejudice remains. It is largely a matter of semantics, but in this circuit we fold the prejudice analysis into the analysis of the Sixth Amendment right itself when the prosecution has improperly interfered with the attorney-client relationship and thereby obtained information about trial strategy. We have construed *Weatherford* to mean that there is no Sixth Amendment violation unless there is prejudice. As we wrote in *United States v. Irwin,* 612 F.2d 1182, 1186–87 (9th Cir. 1980), "From *Weatherford* . . . it is apparent that mere government intrusion into the attorney-client relationship, although not condoned by the court, is not itself violative of the Sixth Amendment right to counsel. Rather, the right is only violated when the intrusion substantially prejudices the defendant." *Id.* at 1186–87 (footnote omitted).

In *Weatherford,* the Court held that there had been no prejudice, based on its confidence that no "tainted evidence" had been introduced at trial. Weatherford testified only as to acts to which he had been an eyewitness. His testimony was directed only to objective factual matters and was independent of what he knew about Bursey's trial strategy. This case is different from *Weatherford* in that "tainted evidence," in the sense intended in *Weatherford,* is not at issue, for Sava did not testify at trial.

Rather, the problem in this case is that Sava obtained, and communicated to the prosecution team, privileged trial strategy information. In *Weatherford,* the Court knew, based on the district court's findings, that Weatherford had not communicated anything, including privileged trial strategy information, to any member of the prosecution team. The Court was therefore entirely confident that the prosecution team had not conducted its pre-trial investigation, introduced evidence at trial, or tailored its strategy and questions based on advance knowledge of Bursey's trial strategy. We cannot have the same absolute confidence here. In this case, by contrast, we know that Trooper Owren, a member of the prosecution team, learned privileged information about Danielson's trial strategy from Sava, and that Owren prepared memoranda and transcripts containing that strategy. We know, further, that AUSA Kent received the memoranda and unredacted transcripts from Owren and that he kept them in his private office.

 Under our precedents, improper interference by the government with the confidential relationship between a criminal defendant and his counsel violates the Sixth Amendment only if such interference "substantially prejudices" the defendant. *Williams v. Woodford,* 306 F.3d 665, 683 (9th Cir.2002). "Substantial prejudice results from the introduction of evidence gained through the interference against the defendant at trial, from the prosecution's use of confidential information pertaining to defense plans and strategy, and from other actions designed to give the prosecution an unfair advantage at trial." *Id.* at 682 (citing *Irwin,* 612 F.2d at 1187). However, it is not clear from our precedents what constitutes "substantial prejudice" and who bears the burden of proof when an improper intrusion into the attorney-client relationship results in the

prosecution's obtaining information about the defendant's trial strategy.

Most Sixth Amendment interference-with-counsel cases involve particular pieces of evidence obtained by the prosecution as a result of the unconstitutional interference. The evidence is often an incriminating statement made to a government informant. *See, e.g., Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964); *United States v. Harris,* 738 F.2d 1068 (9th Cir.1984); *United States v. Shapiro,* 669 F.2d 593 (9th Cir.1982); *United States v. Bagley,* 641 F.2d 1235 (9th Cir. 1981). In other cases, the evidence is physical. For example, in *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the Sixth Amendment violation revealed information that led the police to the body of the victim. In cases where the prosecution has obtained a particular piece of evidence, such as an inculpatory statement or a dead body, we have put the burden on the defendant to show prejudice. In *Bagley,* for example, we wrote that "to establish a violation of *Massiah* defendant must show that he suffered prejudice at trial as a result of evidence obtained from interrogation outside the presence of counsel." 641 F.2d at 1238. Placing the burden on the defendant in such cases makes good sense, for the defendant is in at least as good a position as the government to show why, and to what degree, a particular piece of evidence was damaging.

In cases where wrongful intrusion results in the prosecution obtaining the defendant's trial strategy, the question of prejudice is more subtle. In such cases, it will often be unclear whether, and how, the prosecution's improperly obtained information about the defendant's trial strategy may have been used, and whether there was prejudice. More important, in such cases the government and the defendant will have unequal access to knowledge. The prosecution team knows what it did and why. The defendant can only guess.

In this case, Danielson does not contend that the prosecution team impermissibly learned about a particular piece of evidence. Rather, he contends that it impermissibly obtained information about his trial strategy. While we have previously decided cases in which trial strategy information has been improperly obtained, the issue of whether prejudice was suffered in those cases was never a close question. In *Irwin,* for example, we found no prejudice arising out of the prosecution's learning the defendant's trial strategy because, as we wrote, "[d]efense counsel had [already] revealed the nature of the defense in his initial conference with the prosecutor." 612 F.2d at 1189. Probably for that reason, we have never specifically articulated what constitutes prejudice, and who has the burden of proof, in a trial strategy case.

Other circuits, however, have specifically addressed the issue. In a § 1983 suit arising out of the government's having obtained privileged trial strategy information in a prior criminal prosecution, the D.C. Circuit adopted a per se rule that a criminal defendant's proof of mere possession of improperly obtained trial strategy information by the prosecution constituted proof of prejudice. *See Briggs v. Goodwin,* 698 F.2d 486, 494–95 (D.C.Cir.1983) ("Mere possession by the prosecution of otherwise confidential knowledge about the defense's strategy or position is sufficient in itself to establish detriment to the criminal defendant."). By contrast to the D.C. Circuit's per se rule, the First Circuit has adopted a rule that requires a showing of actual prejudice. Under its rule, once a prima facie showing has been made by the defendant, the burden of proof shifts from

the defendant to the prosecution. *See United States v. Mastroianni*, 749 F.2d 900, 908 (1st Cir.1984).

We agree with *Briggs* about the practical problems facing a criminal defendant trying to show prejudice when the prosecution has obtained information about the defendant's trial strategy:

> The prosecution makes a host of discretionary and judgmental decisions in preparing its case. It would be virtually impossible for an appellant or a court to sort out how any particular piece of information in the possession of the prosecution was consciously or subconsciously factored into each of those decisions.

*Briggs*, 698 F.2d at 494; *see also Mastroianni*, 749 F.2d at 907 (quoting *Briggs*). But we believe, with *Mastroianni*, that those problems can be appropriately addressed without resorting to a rule of per se prejudice.

▌▌▌ The First Circuit established a two-step analysis in *Mastroianni*. First, the defendant must make a "prima facie showing of prejudice." In *Mastroianni* itself, the prima facie showing was made by showing "that confidential communications were conveyed as a result of the presence of a government informant at a defense meeting." 749 F.2d at 907–08. We adopt the *Mastroianni* approach to the first step, but with the following modification: It is not enough to establish a prima facie case to show that the government informant was involuntarily present at a meeting and passively received privileged information about trial strategy. Rather, consistent with the Court's analysis in *Weatherford*, the government informant must have acted affirmatively to intrude into the attorney-client relationship and thereby to obtain the privileged information. Second, under *Mastroianni*, once the prima facie case has been established, "the burden shifts to the government to

show that there has been ... no prejudice to the defendant[ ] as a result of these communications." *Id.* at 908. We adopt the *Mastroianni* approach to the second step without modification.

The Supreme Court's decision in *Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), provides a gloss on the second step of the analysis, which we hereby adopt. In *Kastigar*, the Court held that a potential criminal defendant could be compelled, despite the Fifth Amendment, to testify under a grant of use immunity. The petitioners in *Kastigar* had argued against this result on the ground that it would be difficult for criminal defendants to demonstrate impermissible use of the information by the government. The Court's sensible, and highly practical, solution was to put the burden of showing non-use on the government:

> A person accorded [use] immunity ... and subsequently prosecuted, is not dependent for the preservation of his rights upon the integrity and good faith of the prosecuting authorities. As stated in *Murphy* [*v. Waterfront Comm'n*, 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964) ]:
>
>> Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.
>
> This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

*Id.* at 460, 92 S.Ct. 1653. The Court went on to specify the nature of the government's burden:

> One raising a claim ... need only show that he testified under a grant of immunity in order to shift to the government the heavy burden of proving that all of the evidence it proposes to use was derived from legitimate independent sources.

*Id.* at 461–62, 92 S.Ct. 1653. In this circuit, we have interpreted *Kastigar's* prohibition on use to include both direct and indirect use. For example, information derived from compelled testimony may not be used in providing "assistance in focusing the investigation, deciding to initiate the prosecution, refusing to plea bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." *United States v. Crowson,* 828 F.2d 1427, 1430 (9th Cir. 1987) (quoting *United States v. McDaniel,* 482 F.2d 305, 311 (8th Cir.1973)).

*Kastigar* thus established a burden-shifting analysis that protects a criminal defendant against a violation of the Fifth Amendment by putting the burden of proof on the government that it did not use the privileged information. In the analogous context of protecting a defendant against a violation of the Sixth Amendment, we believe that the *Kastigar* analysis should also apply. The particular proof that will satisfy the government's "heavy burden," *Kastigar,* 406 U.S. at 462, 92 S.Ct. 1653, will vary from case to case, and we therefore cannot be specific as to precisely what evidence the government must bring forward. The general nature of the government's burden, however, is clear. As the Court stated in *Kastigar,* the mere assertion by the government of "the integrity and good faith of the prosecuting authorities" is not enough. *Id.* at 460, 92 S.Ct. 1653. Rather, the government must present evidence, and must show by a preponderance of that evidence,

that "all of the evidence it proposes to use," and all of its trial strategy, were "derived from legitimate independent sources." *Id.* In the absence of such an evidentiary showing by the government, the defendant has suffered prejudice.

We do not believe that adopting the *Mastroianni/Kastigar* approach imposes an unreasonable burden on the prosecution. It is true that once the government has improperly interfered with the attorney-client relationship and thereby obtained privileged trial strategy information, the prosecutor has the "heavy burden" of showing non-use. But the prosecution team can avoid this burden either by not improperly intruding into the attorney-client relationship in the first place, or by insulating itself from privileged trial strategy information that might thereby be obtained.

We recognize that the government has a legitimate interest in investigating independent crimes contemplated or perpetrated by an indicted defendant. We recognize, further, that there are very real practical problems for such an investigation when, as here, that investigation is intended to obtain non-privileged information but risks obtaining privileged trial strategy information as well. In such a case, the prosecution team can do a number of things to insulate itself from privileged trial strategy information. For example, during the prosecution of Manuel Noriega, the government tape recorded telephone calls made by Noriega while he was incarcerated, but it "took steps to shield itself and its case agents from any attorney-client conversations that might be contained on the tapes." *United States v. Noriega,* 764 F.Supp. 1480, 1483 (S.D.Fla.1991). The tapes were screened by a DEA agent who was unaffiliated with the prosecution of Noriega. If a tape contained privileged information, the agent's

job was to "immediately seal and segregate that tape from the others." *Id.* If only a portion of the tape contained such information, "then only a sanitized copy or transcript would be provided to case agents and prosecutors." *Id.*

Nor is an insulation, or "firewall," procedure novel in more ordinary criminal cases. *See, e.g., Crowson,* 828 F.2d at 1430 n.4 (endorsing recommendation in U.S. Attorneys' manual that United States attorneys who are aware of the contents of compelled, immunized grand jury testimony not be involved in the subsequent prosecution of the witness); *Bagley,* 641 F.2d at 1239 ("[T]he government prosecutors in this case were careful to insulate themselves from any information [the informant] might have provided to federal agents who debriefed him; the prosecutors did not receive any notes, tapes, or statements relating to [the informant's] conversations with appellant."). Nor, finally, is use of a firewall device limited to criminal prosecutions. *See, e.g., First Interstate Bank of Ariz. v. Murphy, Weir & Butler,* 210 F.3d 983 (9th Cir.2000) (noting that a judge is required to insulate a law clerk completely from any matters involving a law firm with which the law clerk has accepted employment in order to avoid the appearance of impropriety and that where such insulation fails, the judge must recuse herself because her impartiality might reasonably be questioned).

In this case, AUSA Kent stated that he attempted to insulate himself and the members of his prosecution team from privileged trial strategy information, but these attempts did not go far enough. The prosecution team, based on Owren's initial meeting with Sava on December 8, knew that Sava had learned trial strategy and was on notice that he might learn more. Kent states in his affidavit that sometime in December he told Sava not to inquire into Danielson's trial strategy, but it is undisputed that Sava did so nonetheless. In late December and throughout January, Sava elicited trial strategy information, yet there is nothing in the record indicating that Kent's earlier instruction was ever repeated. Further, the record reveals no attempt, at any point, to insulate the police officers working with Kent as part of the prosecution team from the privileged information.

Kent contends that he sought advice, both locally and from the Department of Justice in Washington, D.C., as to what the prosecution should do to insulate itself from trial strategy information obtained by Sava. The precise nature of the advice thereby obtained has not been made clear in the record. But whatever it was, Kent admitted, when pressed at oral argument, that his actions were not entirely pursuant to that advice:

Kent: I might also indicate your honor that at the very inception when this matter arose I went to the ethics officer in our office, and, because obviously there were some potential Sixth Amendment implications to this particular information. We in turn got on the phone with the professional responsibility office [ ] at the Department of Justice in Washington and talked to a lady who was an attorney there and we ran the scenario by her, and we, uh, we received the stamp of approval.

The Court: That included having the whole thing on file in your office?

Kent: No. No. I don't want to say we got that far, absolutely not, uh, not with regard to the files in my office.

██ The application of the first step of the *Mastroianni/ Kastigar* burden-shifting analysis to the facts of this case is straightforward. Danielson has shown

that the government deliberately sent its informant, Sava, to obtain information from Danielson; that Sava affirmatively acted to elicit privileged trial strategy information from Danielson; that the privileged information thereby obtained was told to, and preserved by, members of the prosecution team; that a member of the prosecution team wrote memoranda about this information; that members of the prosecution team listened to and transcribed transcripts containing this information; and that the prosecutor in charge of the case kept much (perhaps all) of this information in his private office. Under these circumstances, Danielson has shown more than enough to shift the burden to the government to show that it did not use this information.

██ Under the second step of the analysis, *the government must introduce evidence and show by a preponderance of that evidence that it did not use this privileged information.* Specifically, it must show that all of the evidence it introduced at trial was derived from independent sources, and that all of its pre-trial and trial strategy was based on independent sources. Strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and about what to save for possible rebuttal. The district court did not apply this standard in its post-trial hearing in this case. We remand to permit it to hold an evidentiary hearing at which this standard can be applied.

### III. Other Issues

#### A. *Brady* Violation

██ Danielson appeals the district court's denial of his post-trial motions for a

mistrial and for a new trial based on the government's asserted violation of its obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To establish a *Brady* violation, Danielson was required to demonstrate that the government suppressed material, favorable information and that this suppression prejudiced him. *United States v. Ciccone,* 219 F.3d 1078, 1085 (9th Cir. 2000). We review allegations of *Brady* violations de novo. *United States v. Amlani,* 111 F.3d 705, 712 (9th Cir.1997). We hold that there was no *Brady* violation. The favorable material Danielson contends should have been turned over to him amounts to nothing more than his protestations of innocence. The district court did not err in determining that these statements were neither favorable nor material within the meaning of *Brady.*

#### B. Federal Rule of Criminal Procedure 16

██ Danielson also appeals the district court's denial of his post-trial motions for a mistrial and for a new trial, based on an asserted violation of Federal Rule of Criminal Procedure 16 by the government. The government argues not only that the district court's denial of the motions was proper, but also that the district court's initial suppression ruling was erroneous. We review the district court's Rule 16 ruling for abuse of discretion. *United States v. Gonzalez–Rincon,* 36 F.3d 859, 865 (9th Cir.1994). Based on the record now before us, we affirm the district court's ruling.

██ Rule 16 provides, in relevant part:

Upon request of a defendant the government must disclose to the defendant and make available for inspection, copying, or photographing: any relevant written or recorded statements made by the de-

fendant, or copies thereof, within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government. . . .

Fed.R.Crim.P. 16(a)(1)(A). The district court found that the tapes made by Sava contained some recorded statements by Danielson that came within the scope of the rule. Specifically, the district court found:

> the tape recording was relevant to the government's case and the preparation of the defense. Although the government intended to use only portions of the tape-recorded statements as impeachment evidence on cross-examination and rebuttal, the tape recording included statements made by defendant about the pending criminal charges, thus making the tape recording relevant for the purposes of Rule 16.

Because this was not a case in which the statements became relevant only after the defendant testified, the government's reliance on *Gonzalez–Rincon*, 36 F.3d at 865, is misplaced. And its argument that pretrial disclosure of the tapes would have placed Sava in danger lacks merit as well because Sava entered a witness protection program before Danielson's trial began.

■ Danielson argues that the failure to reveal the tapes necessitates a new trial. We disagree. To the extent that there may have been a Rule 16 violation, and to the extent that such a violation was independent of the Sixth Amendment violation discussed above, the district court's suppression of the tapes and the curative instruction adequately addressed the violation. It may be that on remand, as a consequence of the Sixth Amendment evidentiary hearing on prejudice, that Danielson's Rule 16 motion may come to be seen in a new light. We intimate no view as to what the district court should do in that event.

## C. Prior Bad Acts Evidence

■ Notwithstanding Federal Rule of Evidence 404(b), the district court admitted, as evidence of prior bad acts, evidence that: (1) in 1990, Danielson guided some clients into a restricted hunting area without the proper tags; (2) after a 1996 hunt, Danielson told his client that he had found a deer shot by the client and would send it to him for a fee; and (3) after a 1998 hunt, a client could not find the deer he shot but Danielson later found it and demanded additional money from the client in exchange for the deer. We review the district court's decision to admit this evidence for abuse of discretion. *United States v. Johnson*, 132 F.3d 1279, 1282 (9th Cir. 1997).

■ Rule 404(b) excludes evidence of prior bad acts if it is offered to show that the defendant acted "in conformity therewith." Fed.R.Evid. 404(b). In other words, evidence of prior bad acts is not admissible merely to show a propensity for criminal behavior. Evidence that might otherwise be excluded, however, is admissible to prove "motive, intent, preparation, plan, knowledge, identity, or absence of mistake." *Id.* Evidence is admissible under these exceptions if it: (1) tends to prove a material element of the crime; (2) is similar to a charged offense; (3) is supported by sufficient evidence; and (4) is not too remote in time. *See Johnson*, 132 F.3d at 1282. The district court did not abuse its discretion in finding that the evidence relating to the three prior incidents satisfied this test.

■ As with all evidence, the probative value of the evidence of the prior bad acts must outweigh its prejudicial effect. Fed.R.Evid. 403. We review the district court's Rule 403 ruling for an

abuse of discretion, *United States v. Gonzalez–Torres,* 309 F.3d 594, 601 (9th Cir. 2001), and find none here.

### D. Sentencing

██ The district court denied the government's request that it consider thirty instances of uncharged, alleged wildlife violations as relevant conduct for sentencing purposes. None of the alleged violations occurred in the course of the commission of the offense for which Danielson was convicted. Had they been considered, they would have added seven levels to Danielson's guideline range.

██ A district court may consider uncharged conduct for sentencing purposes when the conduct is relevant within the meaning of § 1B1.3(a)(1) of the Sentencing Guidelines. The district court found that the evidence offered by the government was "neither helpful nor relevant" in sentencing Danielson. This finding is not clearly erroneous. *See United States v. Rose,* 20 F.3d 367, 371 (9th Cir.1994).

██ The government also argues that the district court erred in valuing the deer Danielson was convicted of selling to Lingefelt. The district court did not err in determining that the value of the deer was only a portion of the value of the total Lingefelt paid Danielson for the elk and deer hunts.

### E. Reimbursement of Attorney Fees

██ We review the district court's decision not to order reimbursement of attorney fees under 18 U.S.C. § 3006A for an abuse of discretion. *See United States v. Braunstein,* 281 F.3d 982, 992 (9th Cir. 2002). We find no such abuse.

██ The district court found that Danielson lacked the current ability to pay for the cost of his past representation. Although it "question[ed] the veracity" of Danielson's financial statements and was "disturbed by the overwhelming amount of property transfers" that Danielson had made to conceal his assets, the district court did not order reimbursement of attorney fees. The district court explained:

> [D]ue to the restraints this court finds with regard to the finding of current funds available, I am not inclined to order that you pay the cost of past representation. There simply have been too many after-the-fact transfers of property and creation of documents for this court to make any definitive finding as to your ability to pay for the entire cost of your past representation totaling ... more than $100,000. Based on the probation officer's recommendation to which I'm giving great deference, more expertise is needed to know whether or not these funds have been transferred and are or have been at any time available. I am not willing to expend yet more resources on this case to come to some infallible conclusion.... I am not going to order the costs of recovery of attorney's fees.

The government insists that the district court erred by "refusing to reach a decision" on Danielson's present ability to pay, by disregarding Danielson's future ability to pay, and by failing to consider prior fraud.

██ We do not agree that the district court refused to reach a decision. The district court's decision not to appoint a financial expert to make a "definitive finding" as to Danielson's present financial ability did not amount to a "refusal" to consider Danielson's financial situation. Rather, it was a decision that the prerequisite for an order of reimbursement was not met. Under 18 U.S.C. § 3006A(f), a district court may order full or partial reimbursement of attorney fees upon a finding that "funds are available." The statute provides:

Whenever the ... court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the ... community defender organization which provided the appointed attorney ... or to the court for deposit in the Treasury as reimbursement....

18 U.S.C. § 3006A(f); *see also United States v. Lorenzini*, 71 F.3d 1489, 1494 (9th Cir.1995) ("[A] reimbursement order is improper if the court fails to find that the defendant has the *current ability* to repay the government for his attorney fees." (internal quotation marks omitted)); *United States v. Seminole*, 882 F.2d 441, 444 (9th Cir.1989) (a court may order reimbursement of court-appointed attorney fees "only if it finds that [the defendant] has the present ability to pay the fees."). Such a finding must be based on the defendant's current assets, not on his ability to fund payment from future earnings. Therefore, the district court properly disregarded Danielson's future ability to pay in determining whether he should reimburse the Federal Public Defender's Office for attorney fees. Similarly, as Danielson's past conduct had no bearing on his present ability to pay for his defense, the district court did not abuse its discretion in disregarding it.

■ The probation officer found that Danielson had sufficient resources to pay a fine. However, it found that "further investigation and inquiry by a trained financial investigator is in order to determine whether or not Mr. Danielson should be held responsible for reimbursing the Federal Public Defender's Officer for services rendered." The district court gave the probation officer's report appropriate weight. The law does not require that the district court expend extraordinary time and resources to determine a defendant's ability to repay the cost of court appointed representation. The district court did not abuse its discretion in deciding that enough was enough.

■ Finally, the government argues that this court improperly reversed the district court's ruling that Danielson's representation "ends here" when it granted Danielson's unopposed motion for court-appointed representation on appeal. We disagree. A defendant's continued representation on appeal by appointed counsel is "not subject to the discretion of the judge of the district court." *United States v. Dangdee*, 608 F.2d 807, 810 (9th Cir.1979). Rather, it is "automatic, unless a change in [defendant's] financial situation renders him ineligible for continued representation...." *Id.* There is no indication that Danielson's financial situation improved following his sentencing.

## Conclusion

We REMAND to the district court for an evidentiary hearing to determine, consistent with this opinion, whether the government used the privileged trial strategy information improperly obtained by Sava and transmitted to the prosecution team. We otherwise AFFIRM.