*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JEFFREY THOMAS WILLIS,

Defendant-Appellant.

UNPUBLISHED
December 26, 2019

No. 344561
Muskegon Circuit Court
LC No. 16-006040-FC

Before: METER, P.J., and O'BRIEN and TUKEL, JJ.

PER CURIAM.

A jury convicted defendant of first-degree murder, MCL 750.316;[1] and kidnapping, MCL 750.349(1)(c) (knowing restraint with intent to engage in criminal sexual penetration or criminal sexual contact). The trial court sentenced defendant to life imprisonment for first-degree murder and 18 years and 9 months to 40 years' imprisonment for kidnapping. Defendant appeals as of right. We affirm.

## I. BASIC FACTS

Defendant's convictions arise from the disappearance of Jessica Heeringa on April 26, 2013. That evening, Heeringa worked the closing shift at an Exxon gas station. She was last seen by a customer whose receipt was timestamped at 10:52 p.m. At approximately 11:00 p.m., two witnesses saw a silver minivan outside the backdoor to the gas station. As they watched, the van's back hatch opened and closed, and then the van drove away. At 11:14 p.m., a customer called 911 after finding the gas station open—unlocked and lights on—but deserted.

---

[1] The jury convicted defendant of first-degree murder on two theories: premeditation, MCL 750.316(1)(a); and felony-murder, MCL 750.316(1)(b). His judgment of sentence states that his murder conviction is for one count of first-degree murder supported by two theories.

When police arrived, Heeringa's belongings, including her coat, purse, and wallet with $400 inside, were in the store, and her car was in the parking lot. Yet Heeringa was nowhere to be found. Nothing appeared to have been stolen from the gas station, and it appeared that Heeringa had been preparing the store for closing—there were signs that she had been cleaning and closing out the till. Outside the store's only backdoor, the police found some of Heeringa's blood, a battery cover to a laser sight for a Walther P22 pistol, and two watch batteries. Heeringa's body was never discovered. Authorities ran ongoing "proof of life" searches in numerous databases over several years, but those searches never revealed any signs that Heeringa was still alive. Testimony also suggested that she never would have left her three-year-old son.

Acting on a tip that defendant owned a silver minivan, officers spoke to defendant in 2013, shortly after Heeringa's disappearance. At that time, with defendant's permission, officers looked inside defendant's van and noticed that the van had been recently cleaned. The police attempted to contact defendant's wife around the same time, but she never received their recorded messages. Years later, officers would uncover mini-cassette recordings of the phone messages hidden in a shed on defendant's property.

On the night of Heeringa's disappearance, defendant attended a card game at a shop near the gas station. He drove his silver minivan to the game. According to cell phone records, later that evening at 11:23 p.m., defendant was in the vicinity of an empty property—3038 Bailey—that had passed to him after his grandfather's death in 2011. Yet defendant told police that he was home until 12:30 a.m. The Bailey property was 12 or 13 minutes from the Exxon station where Heeringa disappeared. Defendant kept the property padlocked, and various cleaning products, including bleach, were later found in the empty home's basement.

According to testimony at trial, defendant's coworkers also recalled defendant coming to work with deep scratches on his face and arms shortly after Heeringa's disappearance. According to additional testimony at trial, the driver of the van seen behind the gas station on the night of Heeringa's disappearance was described by one of the witnesses as having "pretty" "blond streaks" in his hair, and defendant was known to highlight his hair.

Although police spoke to defendant in 2013, he did not truly become a suspect in Heeringa's disappearance until 2016 when a driver in a silver minivan attempted to abduct a teenage girl, MJN. According to MJN, while she was walking on the side of the road coming home from a party, a man in a silver minivan pulled up next to her and asked if she needed a ride. She asked to use the man's cellphone, and the man told her that she could but asked her to get into the van to do so. Once she was in the van, the man said his phone was dead. The man then pointed a gun at her, and she escaped by leaping from the moving vehicle. MJN identified defendant as the attempted abductor.

During a search of defendant's van in 2016, police found a stolen Walther P22 pistol with the serial number obscured. Police were able to restore the serial number and locate the owner, who was defendant's coworker. The owner testified that the gun had been stolen from her home. She also testified that the gun had a laser sight when she purchased it. However, when the gun was recovered by police, the laser sight was missing.

According to the evidence at trial, defendant used the Walther P22 pistol to kill Rebekah Bletsch, who was found shot to death on a road near her home.[2]  Bletsch's DNA was found on gloves and a vibrator in a locked toolbox.  In a lockbox, which was also locked, Bletch's DNA was found on handcuffs.  In that same lockbox, the police found the Walther P22 pistol.  Defendant's DNA was also found on the gloves, the vibrator, and the gun.  Both the toolbox and lockbox were found in defendant's van, and together the toolbox and lockbox comprised what the prosecutor characterized as defendant's "rape kit," containing various items such as handcuffs, rope, restraints, chains, sex toys, a gag, lubricating jelly, insulin, syringes, a human anatomy diagram with injection points, gloves, Viagra, cameras, and bullets.  Fingerprints, DNA evidence, and defendant's own admissions established defendant as the owner of the toolbox and lockbox.  Officers found a note at 3038 Bailey of what the prosecutor characterized as a "checklist" for many of the items in the toolbox.  The note listed some additional items, including items of women's clothing such as a "hoodie," which Heeringa often wore to work.  The note was confirmed to be in defendant's handwriting.

The prosecutor introduced the events relating to MJN and Bletsch at trial as other-acts evidence in an effort to establish that Heeringa's disappearance was part of defendant's common scheme or plan to kidnap, sexually assault, and murder young women.

In addition to the other-acts evidence, forensic computer analysis of defendant's devices uncovered "vics" folders with subfolders specific to Heeringa and Bletsch; the folders were labeled by Bletsch's and Heeringa's initials and the respective dates of the crimes against them.  The folder relating to Heeringa contained photographs of Heeringa as well as a "missing kidnaped" flyer that circulated after her disappearance.  In another folder, defendant saved a news article relating to Heeringa's disappearance.  A document listing defendant's computer passwords revealed that defendant's password for many of his accounts was J4l27H13—Heeringa's initials (JLH) and the number 42713 (the day after Heeringa's disappearance).  The prosecutor theorized that 4-27-13 was the actual date of Heeringa's death.  In addition to the information specific to Heeringa and Bletsch, defendant's computer contained thousands of pornographic images and videos depicting the abduction, restraint, rape, and murder of women, using many of the same objects found in defendant's van (like restraints and gags).  Defendant also had numerous homemade, voyeuristic videos featuring women and young girls filmed without their knowledge in public places, in their homes, and at swim events.

On the basis of this and other evidence, the prosecutor argued that Heeringa had been kidnapped from the gas station and killed by defendant.  The prosecutor maintained that defendant's motive and intent in kidnapping Heeringa was to engage in criminal sexual penetration or criminal sexual contact.  See MCL 750.349(1)(c).  The jury convicted defendant as stated.  Defendant now appeals as of right.

---

[2] In a separate trial relating to Bletsch, defendant was convicted of first-degree murder and felony-firearm, MCL 750.227b.

## II. OTHER-ACTS EVIDENCE

On appeal, defendant first argues that the trial court abused its discretion by admitting other-acts evidence under MRE 404(b). Defendant challenges the admission of evidence relating to Bletsch, MJN, the theft of the gun from defendant's coworker, the pornography, the voyeuristic videos, a serial-killer list found in a shed on defendant's property, the "vics" folders on defendant's computer, and other miscellaneous evidence, including the purchase of a safe and evidence discovered in his van in 2016. Defendant maintains that the evidence was not relevant to establishing a common plan or scheme, that it could not be offered to complete the story of his crimes, and that he is entitled to a new trial because the evidence was unfairly prejudicial and incredibly harmful to his defense.

Defendant preserved his evidentiary arguments by objecting to the admission of the other-acts evidence in the trial court. See *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001). We review a trial court's decision to admit evidence for an abuse of discretion. *People v Benton*, 294 Mich App 191, 195; 817 NW2d 599 (2011). "An abuse of discretion occurs when the trial court reaches a result that is outside the range of principled outcomes." *Id*. "[A] trial court's decision on a close evidentiary question ordinarily cannot be an abuse of discretion." *People v Hine*, 467 Mich 242, 250; 650 NW2d 659 (2002). Preliminary questions of law regarding the admissibility of evidence, including those relating to application of the rules of evidence, are reviewed de novo. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012). "A preserved trial error in admitting or excluding evidence is not grounds for reversal unless, after an examination of the entire cause, it affirmatively appears that it is more probable than not that the error was outcome determinative." *Id*.

Defendant challenges the admission of other-acts evidence under MRE 404(b)(1), which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"MRE 404(b) governs but does not prohibit all evidence of other acts that risks this character-to-conduct inference; the rule is not exclusionary, but is inclusionary, because it provides a nonexhaustive list of reasons to properly admit evidence that may nonetheless also give rise to an inference about the defendant's character." *People v Jackson*, 498 Mich 246, 259; 869 NW2d 253 (2015) (quotation marks and citation omitted). The Michigan Supreme Court summarized the framework for admitting evidence under MRE 404(b) as follows:

> First, the prosecutor must offer the other acts evidence under something other than a character to conduct or propensity theory. MRE 404(b). Second, the evidence must be relevant under MRE 402, as enforced through MRE 104(b), to an issue of fact of consequence at trial. Third, under MRE 403, a determination

must be made whether the danger of undue prejudice substantially outweighs the probative value of the evidence in view of the availability of other means of proof and other facts appropriate for making decision of this kind under Rule 403. Finally, the trial court, upon request, may provide a limiting instruction under MRE 105. [*People v Sabin (After Remand)*, 463 Mich 43, 55-56; 614 NW2d 888 (2000) (quotation marks and some citation omitted) (brackets omitted).]

## A. BLETSCH AND MJN

The trial court admitted evidence relating to Bletsch's murder and MJN's abduction as relevant to establishing that, when defendant abducted and killed Heeringa, he was carrying out a common scheme, plan, or system. The trial court's decision was not an abuse of discretion.

Under the MRE 404(b) framework, the prosecutor bears the "initial burden to show that the proffered evidence is relevant to a proper purpose under the nonexclusive list in MRE 404(b)(1) or is otherwise probative of a fact other than the defendant's character or criminal propensity." *People v Mardlin*, 487 Mich 609, 615-616; 790 NW2d 607 (2010). Relevance requires consideration of both materiality and probative value. *People v Crawford*, 458 Mich 376, 388-390; 582 NW2d 785 (1998). "[E]vidence of similar misconduct is logically relevant to show that the charged act occurred where the uncharged misconduct and the charged offense are sufficiently similar to support an inference that they are manifestations of a common plan, scheme, or system." *Hine*, 467 Mich at 251. "General similarity between the charged and uncharged acts does not, however, by itself, establish a plan, scheme, or system used to commit the acts." *Sabin (After Remand)*, 463 Mich at 64. "The added element, then, must be, not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." *Id*. at 64-65 (quotation marks, citation, and emphasis omitted).

The trial court characterized the common scheme as a "plan to abduct and assault vulnerable young females in isolated areas in this county with the same gun." The trial court reviewed the facts of each offense, emphasizing that the crimes were committed while the women were isolated and alone, that the victims were all young women, that the events occurred in the same county in a three-year period, and that there was evidence that the same Walther pistol was used in each offense. The trial court also noted that part of defendant's plan or scheme included keeping "mementos of his victims" insofar as he had "vics" folders on his computer relating to Bletsch and Heeringa, and he used computer passwords associated with Heeringa and her death. Additionally, the evidence suggests that defendant used his van to carry out the scheme insofar as Heeringa was taken away in a van, MJN escaped abduction by jumping from his van, and Bletsch was found shot on the side of the road in an isolated location, supporting the inference that defendant drove to that location.

Considering the similarities, the trial court did not err by determining that the other-acts evidence was relevant to whether Heeringa's disappearance was a manifestation of defendant's common plan. This is true even if defendant's plan to abduct isolated women at gunpoint and take them away in his van is not particularly distinctive or unusual and there were some dissimilarities between the cases—"a high degree of similarity is not required, nor are distinctive

or unusual features required to be present in both the charged and the uncharged acts." *People v Steele*, 283 Mich App 472, 480; 769 NW2d 256 (2009). It is enough that the evidence of the uncharged acts supports the inference that defendant employed a common plan in committing the charged offense against Heeringa. See *Hine*, 467 Mich at 252-253. Given the similarities between the cases, the trial court did not abuse its discretion by concluding that the evidence relating to Bletsch and MJN was logically relevant to establishing a common plan, scheme, or system. See *Sabin (After Remand)*, 463 Mich at 66-68.

Contrary to defendant's arguments, the trial court also did not abuse its discretion by declining to exclude the evidence under MRE 403. "Rule 403 does not prohibit prejudicial evidence; only evidence that is unfairly so. Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *Crawford*, 458 Mich at 398. The other-acts evidence establishing that defendant was engaged in a common scheme to abduct Heeringa at gunpoint was highly probative on the significant questions whether defendant kidnapped and murdered Heeringa, whether he acted with premeditation and deliberation, and, for the felony-murder charge, whether he killed her in the course of committing a kidnapping. Indeed, when addressing the question of prejudice, the trial court emphasized the need for the other-acts evidence to establish defendant's plan given that there were no eyewitnesses to Heeringa's abduction. Recognizing that there was a potential for prejudice should the jury use the evidence for propensity purposes, the trial court nevertheless found that this potential did not substantially outweigh the probative value of the other-acts evidence given the similarity of the three crimes, particularly when all the events occurred in close temporal proximity in the same county. The trial court also emphasized the reliability of the other-acts evidence, noting that the evidence consisted, in large part, of reliable physical evidence. See *People v Watkins*, 491 Mich 450, 487; 818 NW2d 296 (2012) (identifying the need for the other-acts evidence, the similarity between the acts, the temporal proximity of the acts, and the reliability of the other-acts evidence as considerations relevant to an MRE 403 analysis).

"The trial court is in the best position to make MRE 403 determinations on the basis of a contemporaneous assessment of the presentation, credibility, and effect of testimony." *Mardlin*, 487 Mich at 627 (quotation marks, citation, and alterations omitted). On the facts of this case, the trial court did not abuse its discretion by determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. Further, the trial court minimized the potential for prejudice by instructing the jury on the use of other-acts evidence, prohibiting the jury from using the evidence to decide that defendant was a "bad person" or "likely to commit crimes," and informing the jurors that they could not convict defendant because the jurors believed he was "guilty of other bad conduct." See *People v Orr*, 275 Mich App 587, 593; 739 NW2d 385 (2007). Overall, the trial court did not abuse its discretion by admitting other-acts evidence relating to Bletsch's murder and MJN's abduction.

## B. THEFT OF THE GUN

In the context of his MRE 404(b) argument on appeal, defendant mentions the theft of the gun from his coworker, noting that the prosecutor offered this evidence to "complete the story." Elsewhere defendant notes that there is no res gestae exception to MRE 404(b), and he asserts that "complete the story" evidence must be logically relevant to show a common plan or

scheme.[3]   It is somewhat unclear from these passing and disconnected statements whether defendant intends to challenge the admission of the evidence relating to the theft of gun on appeal.  By failing to adequately brief the issue, he may be considered to have abandoned it.  See *People v McGraw*, 484 Mich 120, 131 n 36; 771 NW2d 655 (2009).

Regardless, the trial court did not abuse its discretion by admitting evidence about the theft of the gun and associated theft of the coworker's underwear under MRE 404(b).  Although *Jackson*, 498 Mich at 265-276, clarified that there is no res gestae exception to MRE 404(b), the Court did not categorically preclude admission of evidence to complete the story of an offense.  Instead, the *Jackson* Court determined that "complete the story" other-acts evidence is admissible only if it satisfies MRE 404(b).  See *id*. at 276 n 11 (recognizing that evidence of other acts may "prove relevant and necessary to 'complete the story' of the charged conduct and the defendant's guilt") (citation omitted).  Defendant's possession of the gun—and the manner in which he obtained the gun, including the closely-related theft of his coworker's underwear, which she kept next to where she stored the gun and on which defendant's DNA was discovered—completed the story of the offense.  The coworker originally had a laser sight on her Walther P22 pistol that was specifically designed to fit that type of pistol.  But when the gun was discovered in defendant's van, the laser sight was no longer attached.  At the scene of Heeringa's disappearance, officers found blood, the battery cap for a Walther laser sight, and watch-style batteries of the type used to power the laser.  Thus, defendant's theft of the gun was directly—and highly—probative of his identity as the kidnapper and killer.  Cf. *People v Hall*, 433 Mich 573, 580-581; 447 NW2d 580 (1989) ("Evidence of a defendant's possession of a weapon of the kind used in the offense with which he is charged is routinely determined by courts to be direct, relevant evidence of his commission of that offense."); *People v Parker*, 76 Mich App 432, 450; 257 NW2d 109 (1977) ("Determination of the source of a weapon in a murder prosecution is relevant to the case . . . .") (quotation marks and citation omitted).  Moreover, that defendant stole the weapon, failed to register it, and obliterated its serial number were all relevant to assessing defendant's premeditated plan to avoid detection.  See generally *People v McGhee*, 268 Mich App 600, 613; 709 NW2d 595 (2005) (concluding that other-acts evidence relating to attempts to avoid capture was admissible).  Given the significant probative value of this evidence, its admission was not substantially outweighed by the danger of unfair prejudice, so the trial court did not abuse its discretion by declining to exclude evidence relating to the theft of the gun under MRE 403.

### C. PORNOGRAPHY, VOYEURISTIC VIDEOS, & SERIAL-KILLER LIST

Defendant also argues that computer evidence relating to pornography and homemade, voyeuristic videos should not have been admitted because Heeringa did not appear in the videos

---

[3] Contrary to defendant's assertion that evidence offered to complete the story must evince a common plan, MRE 404(b) sets forth a nonexhaustive list of proper purposes, and although there must be "at least one proper noncharacter-based inference linking the prior act to the ultimate inference," *Crawford*, 458 Mich at 390 n 8, there is no requirement that the evidence establish a common plan or scheme.

and it was uncertain if the videos were created before Heeringa's disappearance, so there was no basis for concluding that the videos were evidence of planning or preparation. Elsewhere in his brief, separate from his MRE 404(b) argument, defendant asserts that these materials "gave the impression" that defendant was "a despicable and creepy human being who must have been involved in Ms. Heeringa's disappearance and murder."

In challenging the admission of the pornography and voyeuristic videos, defendant focuses mainly on the *timing* of when these videos were created or discovered as part of a larger argument that events occurring after Heeringa's disappearance could not be considered as evidence of planning or preparation in connection with Heeringa. But whether the videos constitute subsequent or prior bad acts is not dispositive because MRE 404(b), by its very language, allows for admission of other acts that "are contemporaneous with, or prior or subsequent to the conduct at issue in the case." Thus, defendant's timing argument lacks merit.

Aside from his timing argument, defendant's briefing in connection with the pornography and voyeuristic videos is rather cursory. In his other-acts discussion, defendant provides a laundry list of evidence, including the videos, which he maintains had no bearing on the question of planning or preparation. But defendant fails to acknowledge that the prosecutor identified motive and intent as proper purposes for the admission of the videos under MRE 404(b); he does not adequately address the videos' prejudice under MRE 403; and he fails to provide a discussion whether admission of the video evidence would entitle him to relief on appeal because it is more probable than not that any error in the admission of the videos was outcome-determinative. By lumping the pornographic and voyeuristic video evidence with all the other evidence admitted under MRE 404(b) and failing to address the admissibility of the video evidence in particular, defendant has failed to adequately brief the issue. See generally *People v Kelly*, 317 Mich App 637, 648 n 6; 895 NW2d 230 (2016) (recognizing that, when there are multiple pieces of other-acts evidence, each other act must be considered separately to determine whether all, some, or none of the evidence is admissible). Given defendant's cursory treatment of the issue, we could conclude that defendant abandoned his challenge to the admission of the pornographic and voyeuristic videos. See *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004).

Even if we consider the admissibility of this evidence, defendant still would not be entitled to relief on appeal.

Relevant to the admission of the pornography, "lustful disposition" evidence or evidence of a "propensity toward sexual deviancy" is not admissible under MRE 404(b) for proving a defendant's character to show that he acted in conformity therewith to commit the charged offense. See *Sabin (After Remand)*, 463 Mich at 68; *People v Watson*, 245 Mich App 572, 580-582; 629 NW2d 411 (2001). Pornographic evidence, such as photographs depicting nudity, often raises concerns that the evidence is improper lustful-disposition evidence. See *People v Engelman*, 434 Mich 204, 221-224; 453 NW2d 656 (1990); *Watson*, 245 Mich App at 580-582. However, MRE 404(b) does not categorically prohibit the admission of pornographic evidence. As with any other-acts evidence, the admissibility of the pornographic evidence turns on whether

there is a proper purpose other than establishing a character trait such as sexual deviancy for the admission of the evidence.[4]  See *Engelman*, 434 Mich at 221-224; *Watson*, 245 Mich App at 580-582.  "The relationship of the elements of the charge, the theories of admissibility, and the defenses asserted governs what is relevant and material."  *People v VanderVliet*, 444 Mich 52, 75; 508 NW2d 114 (1993), amended by 445 Mich 1205 (1994).

The prosecutor asserted that the pornographic videos—in conjunction with other evidence such as the toolbox—were relevant to defendant's motive and intent to sexually assault Heeringa, Bletsch, and MJN.  The prosecutor argued that defendant essentially used the abduction videos as "research" for his common plan, and that this research and his gathering of tools (many of which were depicted in the pornographic videos) was part of his planning and preparation for the abduction, sexual assault, and murder of young women.  The trial court admitted evidence of the pornographic videos, but it excluded mention of necrophilia and torture, and the court did not allow testimony on a specific video described as a "roadside" abduction video.  Although the prosecutor identified motive and intent as proper purposes, the jury was instructed on intent, but not motive.  We conclude that the trial court did not abuse its discretion by admitting the pornographic videos under MRE 404(b) as proof of defendant's intent.

Defendant was charged with first-degree murder involving a kidnapping.  To convict defendant on the kidnapping charge, the prosecution had to prove that defendant knowingly restrained Heeringa with "the intent to" "[e]ngage in criminal sexual penetration or criminal sexual contact" with her.  MCL 750.349(1)(c).  "A statute that requires a prosecutor to prove that the defendant intended to perform the criminal act creates a general intent crime.  A statute that requires proof that the defendant had a particular criminal intent beyond the act done creates a specific intent crime."  *People v Herndon*, 246 Mich App 371, 385; 633 NW2d 376 (2001).  That this case involves a specific intent crime is significant because what might otherwise be improper sexual proclivity evidence (if offered to prove the commission of a general-intent criminal sexual conduct (CSC) offense) instead serves a proper noncharacter purpose.  That is, defendant's sexual intent is material because the prosecutor was required to show that defendant had the specific intent to engage in criminal sexual penetration or criminal sexual contact with Heeringa.  See MCL 750.349(1)(c).  Compare *Sabin (After Remand)*, 463 Mich at 68 (concluding "lustful disposition" evidence pertaining to individuals other than the victim was *not* admissible to prove *general* intent required for first-degree CSC), with *People v Novak*, 489 Mich 941, 941-942 (2011) (MARKMAN, J., concurring) (concluding that the "minor child incest" story written by the defendant was admissible under MRE 404(b) when defendant had been charged with engaging in "sexual contact" requiring "intentional touching . . . for the purpose of sexual arousal or gratification").  Overall, in the context of the charges against defendant, the pornographic videos featuring abductions, sexual assaults, and murders—including both videos of women who resembled Heeringa and videos in which the items found in defendant's van were utilized—were

---

[4] Defendant is correct that there is no suggestion that Heeringa appeared in any of the videos found on defendant's electronic devices.  But that she is not in the videos does not end the MRE 404(b) inquiry.  The initial question remains whether the prosecutor has identified a proper, noncharacter purpose for the evidence.  See generally *Engelman*, 434 Mich at 221-224.

relevant to establishing that defendant restrained Heeringa with "the intent to" engage in criminal sexual penetration or criminal sexual conduct. See MCL 750.349(1)(c). In short, the evidence was logically relevant for a proper purpose under MRE 404(b).

Under MRE 403, the probative value of the pornographic evidence was not substantially outweighed by unfair prejudice. None of the videos were actually played for the jury. Instead, a general description of the videos' content was given by the forensic analyist who examined defendant's electronic devices. The trial court further limited the prejudicial effect by excluding evidence of videos involving (1) necrophilia and (2) gruesome torture. The trial court also prevented the prosecutor from describing any particular video in detail, explicitly excluding any description of the "roadside abduction" video. Given the trial court's efforts to limit the evidence's prejudicial effect, and considering the videos' probative value for whether defendant restrained Heeringa with intent to commit criminal sexual penetration or contact, there was no danger that marginally probative evidence would be given undue or preemptive weight by the jury. See *Crawford*, 458 Mich at 398. Accordingly, MRE 403 did not require exclusion of the evidence. And, as noted earlier, the trial court limited any prejudice by instructing the jury on the proper use of other-acts evidence, which further alleviated any prejudice. See *Orr*, 275 Mich App at 593. Defendant has not shown that the trial court abused its discretion by admitting the pornographic videos.

Whether evidence of the voyeuristic videos made by defendant was similarly admissible under MRE 404(b) poses a closer question. In seeking to introduce this evidence the prosecutor failed to explain with any specificity how the homemade videos were relevant under MRE 404(b), and the purpose of the voyeuristic videos is not readily apparent when it appears that none of the videos depicted Heeringa or defendant's other victims, there is no indication that defendant similarly filmed the victims in their homes or in public locations, and the videos made by defendant do not depict abductions, sexual assaults, murder, or other similar conduct that would be relevant to his intent in kidnapping Heeringa or any other proper purpose under MRE 404(b). It is the prosecutor's "initial burden to show that the proffered evidence is relevant to a proper purpose under the nonexclusive list in MRE 404(b)(1) or is otherwise probative of a fact other than the defendant's character or criminal propensity." *Mardlin*, 487 Mich at 615-616. But the prosecutor failed to present a theory of relevancy that would warrant admission of the voyeuristic evidence under MRE 404(b), so it should have been excluded. See *Crawford*, 458 Mich at 390 ("If the prosecutor fails to weave a logical thread linking the prior act to the ultimate inference, the evidence must be excluded, notwithstanding its logical relevance to character.").

Likewise, evidence of the serial-killer list (the admission of which defendant challenges on appeal) should likely not have been admitted at trial. This list of serial killers was found in a shed on defendant's property, as stated earlier. The list contains a handwritten hash mark next to the names Lawrence Bittaker and Roy Norris, who according to testimony at trial were known as the "toolbox killers." The handwritten hash mark states that "Lawrence Bittaker and Roy Norris: kidnapped, tortured, raped and murdered five girls in 1979." The prosecutor asserted in the lower court that the list was evidence of defendant's research and planning, including his inspiration for buying a van. But as defendant points out, the serial-killer list was not printed by defendant until September 26, 2014, *after* Heeringa's disappearance and several months after defendant purchased his van. Without any indication that defendant viewed the list before buying his van, it is challenging to see how the list could have served as the inspiration for his

-10-

van purchase. Moreover, the list contains no indication that Bittaker and Norris used a van or even that they were the "toolbox killers." We therefore fail to see how the list could be evidence of defendant's research and planning, or how it inspired defendant to buy the van. The prosecutor did not otherwise identify a reason for the list's relevance, MRE 401, or what proper purpose there could be for admitting the evidence under MRE 404(b).

Even though the serial-killer list and voyeuristic videos should not have been admitted, defendant is not entitled to relief. After an examination of the entire case, it does not affirmatively appear more probable than not that the errors were outcome-determinative. See *King*, 297 Mich App at 472. In this respect, it bears emphasizing that, although the forensic computer analyst provided a description of the videos, defendant's voyeuristic videos were *not* played for the jury at the trial. Generally speaking, an oral description may be considered less likely to excite passion and prejudice than the actual photographs or images. See *People v Mills*, 450 Mich 61, 76-77; 537 NW2d 909 (1995), mod 450 Mich 1212 (1995). That the videos were not shown to the jury reduced the amount of prejudice caused to defendant. The trial court further limited the prejudice of this evidence by excluding testimony from one of the women whom defendant filmed without permission. The oral description of defendant's voyeuristic videos was also relatively brief. Testimony of the serial-killer list was likewise relatively brief and isolated.

In contrast to the brief erroneously admitted testimony, there was strong untainted evidence that defendant kidnapped and murdered Heeringa as part of a common plan or scheme to abduct, sexually assault, and murder young women. The forensic evidence—including DNA and ballistics—overwhelmingly established that defendant killed Bletsch. Defendant's van as shown in the blueberry farm videos as well as MJN's identification of defendant and defendant's own admissions conclusively linked him to MJN's abduction. And the circumstantial evidence—including the battery cap for the laser sight for a Walther P22 pistol found at the gas station, defendant's possession of a Walther P22 pistol missing its previously attached laser sight, defendant's theft of a Walther P22 pistol shortly before Heeringa's disappearance, the type of van used in Heeringa's abduction, evidence that defendant cleaned his van and came to work with scratches shortly after Heeringa's disappearance, defendant's decision to keep and conceal items such as the cassettes tapes of police phone calls that defendant hid in his shed, defendant's close proximity to the gas station on the night of Heeringa's disappearance, defendant's visit to the vacant Bailey property after 11:00 p.m. on the night of Heeringa's disappearance, defendant's "rape kit" in his van and the checklist found at the Bailey home, the "vics" folders on his computer, and defendant's computer passwords centered on Heeringa's death—strongly supported the conclusion that Heeringa's disappearance was another manifestation of defendant's plan to abduct, sexually assault, and murder young women. In context, considering the admission of the voyeuristic videos and serial-killer list "in light of the weight and strength of the untainted evidence," defendant has not shown that it is more probable than not that the error was outcome-determinative. *People v Lyles*, 501 Mich 107, 118; 905 NW2d 199 (2017) (quotation marks and citation omitted). Overall, given the properly admitted other-acts evidence and the other strong untainted evidence of defendant's guilt, it seems highly unlikely that the jury's verdict was influenced by the brief testimony of improperly admitted evidence. Defendant is therefore not entitled to relief.

### D. MISCELLANEOUS EVIDENCE

Finally, in the course of his MRE 404(b) argument, defendant mentions other miscellaneous pieces of evidence, including his purchase of a safe in the spring of 2014, the "vics" files and Heeringa files on his computer, and the police visit to his home in 2013 during which they looked in his van. Much of this evidence, like the purchase of the safe and defendant's clean van in 2013, does not implicate MRE 404(b) because the purchase of a safe and having a clean van is not the type of bad character evidence that would give rise to an improper propensity inference. See *Crawford*, 458 Mich at 384 ("Underlying the rule is the fear that a jury will convict the defendant inferentially on the basis of his bad character rather than because he is guilty beyond a reasonable doubt of the crime charged."). Moreover, much of the evidence that defendant contests as character evidence is not subject to MRE 404(b) scrutiny. For instance, evidence of the "vics" folder and defendant's using of passwords associated with Heeringa does not seem to be conduct objectionable under MRE 404(b) because it was directly relevant to whether defendant was involved with the kidnapping and death of Heeringa. See *Jackson*, 498 Mich at 262 (explaining that "acts comprised by or directly evidencing the 'conduct at issue' are not subject to scrutiny under MRE 404(b)"). That defendant labeled a folder "vics," and then listed Heeringa with the date of her disappearance tends to make it more likely than not that her disappearance was linked to being a victim of some act by defendant. And defendant's making his passwords Heeringa's initials and the date *after* her disappearance, combined with the evidence that authorities never found any "proof of life" for Heeringa despite continuous searches, tends to make it more likely than not that defendant knew that Heeringa died the day after she disappeared.

Regardless, the evidence that defendant points to is related to his timing argument. He asserts that events after Heeringa's death are not evidence of planning or preparation for purposes of establishing a common plan under MRE 404(b). More generally, defendant seems to suggest that evidence of what he considers subsequent conduct—including evidence discovered after MJN's attempted kidnapping like the gun, the evidence in the van, and the "vics" folders and password information on his computer—is not relevant to whether defendant previously kidnapped and murdered Heeringa.

Defendant's timing argument is without merit because evidence of subsequent other-acts is admissible under the plain language of MRE 404(b), which allows admission of "other crimes, wrongs, or acts [that] are contemporaneous with, or prior or subsequent to the conduct at issue in the case." And more generally, evidence of defendant's conduct after Heeringa's death can be relevant and admissible in this homicide prosecution notwithstanding that the conduct occurred after Heeringa's death. See *People v Paquette*, 214 Mich App 336, 342; 543 NW2d 342 (1995) ("Defendant's conduct after the killing is relevant to a determination whether there was premeditation and deliberation sufficient for a finding of first-degree murder."). In short, evidence relating to Bletsch and MJN, and evidence discovered after MJN's attempted kidnapping that was relevant to establishing defendant's commission of the crimes charged, was not inadmissible under MRE 404(b) merely because Heeringa was killed first.

As a related matter, there is no merit to defendant's assertion that his crimes against Heeringa could not have been part of a common scheme because some of defendant's acts—like purchasing the safe to hold his gun and other supplies—occurred after her death. As noted, a

common scheme does not require "a high degree of similarity," "nor are distinctive or unusual features required to be present in both the charged and the uncharged acts." *Steele*, 283 Mich App at 480. For example, defendant did not need to store his gun in the same safe[5] before committing all the offenses in order for the prosecution to prove that the crimes against Heeringa, Bletsch, and MJN "had a concurrence of common features so that the charged acts and the other acts are logically seen as part of a general plan, scheme, or design." *Id*. Defendant's arguments to the contrary are without merit.

### III. JURY PARTIALITY

Defendant argues that the trial court abused its discretion by denying defendant's motion to change venue because of defendant's fear that he could not receive an impartial jury due to the case's "egregious and far reaching" pretrial publicity. In the alternative, defendant asserts that defense counsel provided ineffective assistance by failing to strike partial jurors. We disagree.

At the outset, we note that the circumstances in this case are similar to *People v Clark*, 243 Mich App 424, 425-426; 622 NW2d 344 (2000), wherein this Court explained:

> Defendant first argues that the trial court erred in denying his motion to change venue, which was brought on the basis of prejudicial pretrial publicity. However, we conclude that defendant has waived review of this issue. Defense counsel moved for a change of venue before trial. The trial court denied the motion without prejudice, stating that it was willing to reconsider the motion at any time during the jury selection process. A thorough jury selection process ensued, which included lengthy juror questionnaires, the participation of the attorneys in voir dire, and sequestered questioning of each potential juror. Defense counsel never renewed the motion for a change of venue, but, rather, expressed satisfaction with the jury after the jury selection process was completed. Defense counsel's failure to renew the motion and his expression of satisfaction with the jury waived the change of venue issue.

Like the *Clark* defendant, defendant here waived review of his motion to change venue. Before trial, defendant filed a motion to change venue *or* for modified voir dire. The trial court granted defendant's request for modified voir dire, and consistent with defendant's requests for modified voir dire, the jury selection in this case included (1) use of written questionnaires about the potential jurors' preexisting knowledge of the case, (2) extensive questioning by the attorneys, and (3) sequestered questioning of each potential juror while the remaining jurors waiting in the "jury assembly room." Jury selection involved a larger than normal jury pool, and the questioning by attorneys was thorough and extensive. At no time during or after these modified procedures did defense counsel renew the motion to change venue. To the contrary, at the end of voir dire, defense counsel affirmatively approved of the jury, stating "we're satisfied."

---

[5] More generally, the fact that defendant purchased the locked safe in which the gun was found was clearly relevant to establishing his dominion and control over the Walther P22 pistol.

By agreeing to modified voir dire procedures, failing to renew his motion to change venue, and then expressing satisfaction with a jury selected after thorough voir dire, defendant waived review of his motion to change venue. See *id.*

Even if we reviewed defendant's motion to change venue, he would not be entitled to relief on appeal. "The right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial indifferent jurors." *People v Jendrzejewski*, 455 Mich 495, 501; 566 NW2d 530 (1997). "The existence of pretrial publicity, standing alone, does not necessitate a change of venue." *People v Cline*, 276 Mich App 634, 639; 741 NW2d 563 (2007) (quotation marks and citation omitted). Reversal is warranted if, under the totality of circumstances, the defendant's trial was not fundamentally fair. *Jendrzejewski*, 455 Mich at 502. We conclude that, considering the totality of the circumstances, defendant has not shown that he was denied an impartial jury, particularly when the trial court employed modified voir dire procedures to address the question of pretrial publicity, defense counsel did not seek to remove jurors despite having peremptory challenges remaining, and the selected jurors indicated that they could be impartial. See *Jendrzejewski*, 455 Mich at 509; *Cline*, 276 Mich App at 638-639; see also *People v Partee*, 130 Mich App 119, 128; 342 NW2d 903 (1983).

We similarly find no merit to defendant's contention that defense counsel provided ineffective assistance during jury selection. "To establish ineffective assistance of counsel, defendant must show (1) that defense counsel's performance was below an objective standard of reasonableness under prevailing professional norms and (2) that there is a reasonable probability that, but for counsel's errors, a different outcome would have resulted." *People v Jackson*, 292 Mich App 583, 600-601; 808 NW2d 541 (2011). Juror selection for a given case is a matter of trial strategy, and requires attorneys to use their judgment to attain jurors they believe to be "reasonable, fair, and honest." *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008). See also *People v Johnson*, 245 Mich App 243, 259; 631 NW2d 1 (2001) (Opinion by O'CONNELL, J.) ("[A]n attorney's decisions relating to the selection of jurors generally involve matters of trial strategy.") Jurors are presumed competent and impartial, and the party alleging a basis for disqualification bears the burden of proving it. *People v Collins*, 166 Mich 4, 9; 131 NW 78, 80 (1911).

Defendant challenges defense counsel's decision not to utilize peremptory challenges to excuse five jurors. The jurors in question admitted exposure to some pretrial publicity or other information about the case, but defendant has failed to establish that counsel's choice to not use a preemptory challenge for any of these jurors was objectively unreasonable as a matter of trial strategy.

Juror MJ acknowledged that she had been exposed to some media accounts of the events surrounding Heeringa's disappearance and defendant's alleged involvement, but she testified that she could focus solely on the facts and evidence presented at trial when making her decision. She also stated that she could give an "unbiased opinion," unaffected by any past media exposure, and that she had no opinions on whether defendant kidnapped Heeringa or whether Heeringa was alive or dead. In light of her assurances that she could be impartial, we do not believe that it was objectively unreasonable for defense counsel to not object to MJ sitting on the jury panel.

Juror SG went to Bletsch's house a few times with his mother when he was a child, but he denied that his mother had any "real" or "firm" friendship with the family, and specifically denied that his mother's former friendship would impact his decision. More generally, SG stated that he could decide the case on the evidence, separate from anything he may have heard about the case outside the courtroom, and that he would have no problem remaining fair and impartial. "Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions." *Unger*, 278 Mich App at 258. Moreover, this Court must "affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he or she did." *People v Gioglio (On Remand)*, 296 Mich App 12, 22; 815 NW2d 589 (2012), vacated in part on other grounds 493 Mich 864 (2012) (citation and quotation marks omitted). Defense counsel had the benefit of witnessing SG's responses, reading extensive jury questionnaires, and going through four days of voir dire to find jurors that he believed could be reasonable, fair, and honest. In so doing, defense counsel was able to gauge SG's responses in person to determine whether he was being truthful when he said that he could be impartial. By not objecting to SG, counsel appears to have determined that SG was being honest. Moreover, defense counsel had the benefit of knowing who remained in the pool available for selection, having had the opportunity to thoroughly examine the other potential jurors. Defense counsel very well could have judged SG to be the most likely candidate to be reasonable, fair, and honest. Because we will not substitute our judgment for that of defendant's counsel, *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999), counsel's decision to not object to SG was not objectively unreasonable trial strategy.

For similar reasons, we do not believe that defense counsel was ineffective for not objecting to Juror MB. MB lived on the same road as Bletsch's family and knew Bletsch's family, though he did not know Bletsch personally. He also had heard some information about the case and that there was a guilty verdict in the Bletsch case. MB said that he thought that Heeringa was "no longer with us" because she had not shown up, but he clarified that he had no opinion on what may have happened to her. Though defense counsel could have objected to MB, we do not see counsel's choice to not do so as unreasonable. Again, defense counsel had the benefit of seeing MB's "facial expressions, body language, and manner of answering questions." *Unger*, 278 Mich App at 258. Merely living near and knowing Bletch's family does not establish that MB could not be impartial, particularly when he did not know Bletsch personally. We have no reason to doubt that defense counsel was able to gauge whether MB honestly believed he could be impartial, and having clearly concluded that he could, we have no reason to second-guess defense counsel's strategy in the selection of MB for the jury.

Juror PS disclosed that she happened to be in the courtroom awaiting her own civil trial during defendant's arraignment, but also stated that she did not remember what he was wearing or what was said in court. PS also stated that she could put aside any outside information and decide the case on the evidence, following the trial court's instructions. We conclude that PS's simply being in the courtroom during defendant's arraignment is not enough to establish that she could not be impartial, especially given her assurances that she could not remember what was said at the time and that she could be fair and impartial. Thus, defendant has not established that PS should have been disqualified, or that defense counsel was ineffective for not using a preemptory challenge to disqualify PS.

Defendant lastly challenges defense counsel's decision not to use a preemptory challenge for Juror HM, who stated that it was her impression that "[f]rom the media's perspective" defendant was guilty, and that, on the basis of media reports, she thought it "more likely" that defendant was guilty. However, she indicated that only "the evidence" could determine whether someone was guilty and that she believed someone was innocent until proven guilty. Based on HM's opinions from the media reports, defense counsel sought to dismiss HM for cause. At that point, the trial court questioned HM, and she agreed that the media was not always accurate and that there were instances of incorrect reporting. HM also stated that she could put aside any opinions she had previously formed and hold the prosecutor to his burden to prove defendant guilty. On the basis of these assurances, the trial court denied defense counsel's motion. During additional questioning, HM again stated that she could be fair and impartial, that she could follow the trial court's instructions, and that she could "forget anything outside" the trial. Defendant contends on appeal that HM's statements about the media were "her true and honest statements about the opinions that she had," but, again, unlike defense counsel, "we cannot see the jurors or listen to their answers to voir dire questions." *Unger*, 278 Mich App at 258 (quotation marks and citation omitted). We presume that, based on defense counsel's witnessing HM's responses, defense counsel credited HM's statements that she could put aside media reports and be a fair and impartial juror. In these circumstances, we will not second-guess this judgment call by defense counsel. *Rockey*, 237 Mich App at 76-77.

In sum, while defendant complains of potential biases and preformed opinions, defendant has not shown that defense counsel failed to exercise sound trial strategy to select what counsel surely believed was a "reasonable, fair, and honest jury." Cf. *Unger*, 278 Mich App at 257-258 (rejecting claim that counsel was ineffective for failing to challenge a potential juror who stated that he could be fair and impartial but acknowledged that he had read newspaper accounts of the case). See also *Jendrzejewski*, 455 Mich at 515-516; *Johnson*, 245 Mich App at 259.

Lastly, defendant notes that during the sequestered phase of questioning about pretrial publicity, a few of the potential jurors mentioned conversations about the case that were occurring in the jury assembly room among potential jurors waiting to be questioned. Defendant argues that, given these conversations, defense counsel should have requested a special instruction to prevent conversations among potential jurors, and that counsel's failure to do so amounts to ineffective assistance. However, as discussed, the jurors were questioned extensively about their knowledge of the case and their sources of that knowledge. The jurors chosen indicated that they could be fair and impartial, that they could set aside outside information and decide the case on the evidence presented, and that they could follow the trial court's instructions. The trial court instructed the chosen jurors not to discuss the case among themselves until the jurors had heard all the evidence, and to not watch media accounts, conduct research, or discuss the case with friends or family. Further, the trial court instructed the jury to consider only "the evidence that was properly admitted" during trial. Jurors are presumed to follow their instructions, *People v Breidenbach*, 489 Mich 1, 13; 798 NW2d 738 (2011), and these instructions were sufficient to protect defendant's right to have the trial decided on the evidence presented. On this record, given the instructions provided and the jurors' assurances that they could be impartial, defendant has not shown that counsel performed unreasonably by failing to request a special instruction, and defendant has not shown a reasonable probability that

a special instruction would have affected the outcome of the proceedings. Accordingly, his ineffective assistance claim is without merit. See *Jackson*, 292 Mich App at 600-601.

## IV. SEARCH OF ELECTRONIC DEVICES

Next, defendant maintains that the trial court erred by denying his motion to suppress the evidence seized from his electronic devices. According to defendant, the evidence should have been suppressed because the search warrant was overbroad, the affidavits failed to show probable cause for the search of defendant's electronic devices, and the good-faith exception to the exclusionary rule did not apply. We disagree.

We review de novo a trial court's ultimate decision on a motion to suppress. *People v Mahdi*, 317 Mich App 446, 457; 894 NW2d 732 (2016). The trial court's factual findings on a motion to suppress are reviewed for clear error. *Id*. A finding of fact is clearly erroneous if, after a review of the entire record, an appellate court is left with a definite and firm conviction that a mistake has been made. *Id*. Whether the Fourth Amendment was violated and whether the exclusionary rule applies are questions of law reviewed de novo. *Id*.

The United States and Michigan Constitutions protect against unreasonable searches and seizures. US Const Am IV; Const 1963, art I, § 11. "A search or seizure is considered unreasonable when it is conducted pursuant to an invalid warrant or without a warrant where the police officer's conduct does not fall within one of the specific exceptions to the warrant requirement." *People v Hellstrom*, 264 Mich App 187, 192; 690 NW2d 293 (2004). "Ordinarily, if a warrant is determined to be invalid because it lacked a probable-cause basis or was technically deficient in some other manner, any evidence seized pursuant to that warrant, or seized subsequently as a result of the initial illegal search, is inadmissible as substantive evidence in related criminal proceedings." *Id*. at 193.

However, there are exceptions to the exclusionary rule, including the good-faith exception adopted by the Michigan Supreme Court in *People v Goldston*, 470 Mich 523, 526; 682 NW2d 479 (2004). In adopting the good-faith exception, the Court explained that "[t]he purpose of the exclusionary rule is to deter police misconduct," *id.*, and "the goal of the exclusionary rule would not be furthered where police officers act in objectively reasonable good-faith reliance on a search warrant," *id*. at 538. Under the good-faith exception, searches "pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Hellstrom*, 264 Mich App at 197 (quotation marks and citation omitted). However, there are times when an officer will have no reasonable grounds for believing that the warrant was properly issued. See *id*. As summarized by this Court:

> Reliance on a warrant is reasonable even if the warrant is later invalidated for lack of probable cause, except under three circumstances: (1) if the issuing magistrate or judge is misled by information in the affidavit that the affiant either knew was false or would have known was false except for his or her reckless disregard of the truth; (2) if the issuing judge or magistrate wholly abandons his or her judicial role; or (3) if an officer relies on a warrant based on a "bare bones" affidavit so lacking in indicia of probable cause as to render official belief in its

existence entirely unreasonable. [*People v Czuprynski*, 325 Mich App 449, 472; 926 NW2d 282 (2018) (citation omitted).]

The good-faith exception may also not apply when, "depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *United States v Leon*, 468 US 897, 923; 104 S Ct 3405; 82 L Ed 2d 677 (1984).

When ruling on a motion to suppress, a court is not required to first evaluate the validity of a warrant, but may instead choose to " 'turn[] immediately to a consideration of the officers' good faith.' " *Hellstrom*, 264 Mich App at 199, quoting *Leon*, 468 US at 925. "[T]he good-faith exception, turning as it does on objective reasonableness, should not be difficult to apply in practice. When officers have acted pursuant to a warrant, the prosecution should ordinarily be able to establish objective good faith without a substantial expenditure of judicial time." *Hellstrom*, 264 Mich App at 197-198 (quotation marks and citation omitted).

When the trial court ruled on defendant's motion to suppress, it did not address the validity of the warrant, and instead turned immediately to the question of good faith. It determined that the officers conducting the search of defendant's home and electronic devices acted in good-faith reliance on the warrant. For the reasons explained below, the trial court's reasoning was sound. Defendant has not shown clear error in the trial court's factual findings, and those findings support the trial court's conclusion that the exclusionary rule does not apply.

Undisputedly, the police had a warrant for the search, and this is not a case where officers lacked reasonable grounds for believing the warrant was valid. See *id*. at 199. There is no indication that the affidavits contained false information, and there is no suggestion that the judge signing the warrant abandoned his judicial role. See *Czuprynski*, 325 Mich App at 472. Moreover, the warrant was not facially deficient; it specified the place to be searched and provided a detailed list of the items to be seized, including electronic devices. See *Leon*, 468 US at 923.

Further, the affidavits were detailed, and cannot be described as "bare bones." See *Czuprynski*, 325 Mich App at 472. The warrants were issued after defendant attempted to kidnap MJN, and defendant's main challenge to the warrant is his belief that MJN's kidnapping had no connection with electronic devices. But in the affidavit in support of the warrant, Detective Matt Schultz specified, on the basis of his knowledge and experience, that individuals engaging in these types of behaviors (kidnapping) tend to follow media reports about their crimes, which the trial court aptly recognized are likely to be stored electronically. Cf. *Hellstrom*, 264 Mich App at 199 & n 7 (applying good-faith exception when affiant had personal knowledge that "pedophiles generally possess pornographic images" and noting that "[a]n affiant's representations based on his experience can be considered in determining whether probable cause exists"). Furthermore, the affidavit dated May 12, 2016, detailed information suggesting that defendant was engaged in stalking-type behavior, including videotaping and following women. Considered in conjunction with defendant's abduction of MJN, information about defendant's videotaping of women provided further reason to believe that evidence of a crime would be found on defendant's electronic devices. Cf. *id*. at 199-200. On these facts, "[t]he supporting affidavits were not so lacking in indicia of probable cause that the officers could not objectively believe that the

-18-

warrant was supported by probable cause." *Id*. at 199 (quotation marks and citation omitted). In these circumstances, the trial court properly refused to apply the extreme sanction of exclusion.

## V. *BRADY* VIOLATION

In his Standard 4 brief, defendant asserts that the prosecutor withheld exculpatory evidence regarding the ballistics analysis of the bullets that killed Bletsch. Defendant's claim is unpreserved and therefore reviewed for plain error. See *People v Green*, 322 Mich App 676, 681; 913 NW2d 385 (2018). Defendant has not shown plain error.

Under *Brady*,[6] "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *People v Chenault*, 495 Mich 142, 149; 845 NW2d 731 (2014) (quotation marks and citation omitted). To establish a *Brady* violation, a defendant must show that "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) that is material." *Id*. at 150. "To establish materiality, a defendant must show that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. (quotation marks and citation omitted).

Defendant contends that the prosecutor withheld laboratory reports and chain of custody information relating to the ballistics evidence. According to defendant, the withheld reports were exculpatory insofar as they would have revealed mistakes, undermined the chain of custody, led to discovery of rebuttal witnesses, and exposed the perjury of the state's ballistics expert.

Defendant's claims are without merit. Quite simply, there is nothing in the record to support defendant's assertions that he was not provided with the materials in question or to show that the materials were favorable to the defense. See *People v Elston*, 462 Mich 751, 761-762; 614 NW2d 595 (2000). Defendant's arguments center mainly on the correction of a report by Lieutenant Jeff Crump. Lieutenant Crump testified that he modified an earlier report to correct an error in the police agency designation.[7] The updated report, with the original report attached, was admitted at trial. Although defendant now claims on appeal that these materials were withheld from him, these materials—by defendant's own admission—were introduced at the trial relating to Bletsch, which occurred several months before the current case relating to Heeringa. On these facts, defendant has not shown that the prosecutor suppressed material evidence favorable to the accused, and therefore, his *Brady* claim is without merit.

---

[6] *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

[7] Defendant also maintains on appeal that Lieutenant Crump committed perjury, but there is no evidence that Lieutenant Crump lied about the reason for the correction or anything else. At most, any inconsistency between Lieutenant Crump's reports was a matter of credibility and a subject for impeachment. See *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998).

## VI. INTERFERENCE WITH ATTORNEY-CLIENT PRIVILEGE

In his Standard 4 brief, defendant also asserts that the trial court abused its discretion by denying defendant's motion to dismiss after the government violated his Sixth Amendment right to counsel when it interfered with his attorney-client privilege by reading materials intended for defendant's attorney. We disagree.

Initially, we note that defendant abandoned his Sixth Amendment claim by failing to adequately brief the issue on appeal. In his brief, defendant makes passing references to the state "stealing" notes intended for his attorney and intruding "into his trial strategies." But he fails to develop a meaningful argument supported by facts and law. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *People v Matuszak*, 263 Mich App 42, 59; 687 NW2d 342 (2004) (quotation marks and citation omitted). "Such cursory treatment constitutes abandonment of the issue." *Id*.

In any event, defendant's claim that the government violated his Sixth Amendment right to counsel by intruding on the attorney-client privilege is without merit. In the trial court, defendant maintained that jail authorities and investigators contrived to violate his attorney-client privilege by obtaining the following materials intended for his attorney: (1) notes from the pocket of defendant's jail jumpsuit found when defendant sent his jumpsuit to be laundered in August 2016, (2) notes on a legal pad in his cell that were viewed and copied during a search of defendant's jail cell on September 2, 2016, and (3) papers in an envelope marked confidential in his cell, which were viewed during the September search and again during a search in October 2016. This same issue was raised in the Bletsch case, where the trial court rejected the argument. When defendant raised the issue here, the trial court incorporated its findings of fact and conclusions of law from the Bletsch case.

A trial court's decision on a motion to dismiss is reviewed for an abuse of discretion. *People v Patton*, 325 Mich App 425, 431; 925 NW2d 901 (2018). A trial court's factual findings are reviewed for clear error. MCR 2.613(C); *People v Garland*, 286 Mich App 1, 7; 777 NW2d 732 (2009). "Generally, whether a defendant's right to counsel was violated is a constitutional issue that this Court reviews de novo." *People v Hoang*, 328 Mich App 45, 54-55; ___ NW2d ___ (2019). Whether a privilege applies is a legal question reviewed de novo. *People v Carrier*, 309 Mich App 92, 104; 867 NW2d 463 (2015).

"The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Leibel v Gen Motors Corp*, 250 Mich App 229, 237; 646 NW2d 179 (2002) (quotation marks and citations omitted). "[S]tanding alone, the attorney-client privilege is merely a rule of evidence; it has not yet been held a constitutional right." *Howell v Trammell*, 728 F3d 1202, 1222 (CA 10, 2013) (quotation marks and citation omitted). Nevertheless, courts have acknowledged that to meaningfully implement the right to counsel, privacy of communication with counsel is essential. See *Weatherford v Bursey*, 429 US 545, 554 n 4; 97 S Ct 837; 51 L Ed 2d 30 (1977); *United States v Brugman*, 655 F2d 540, 546 (CA 4, 1981). It follows that a violation of the attorney-client privilege may implicate a defendant's Sixth Amendment right to counsel "when the government interferes with the

relationship between a criminal defendant and his attorney." *Howell*, 728 F3d at 1222 (quotation marks and citation omitted; emphasis omitted). To establish a constitutional violation of the Sixth Amendment right to counsel arising from interference with the attorney-client privilege, "a criminal defendant must show two things: first, that the government knowingly intruded into the attorney-client relationship; and second, that the intrusion demonstrably prejudiced the defendant . . . or created a substantial threat of prejudice." *United States v Singer*, 785 F2d 228, 234 (CA 8, 1986).

As relevant to defendant's argument, the constitutional right implicated by invasion of the attorney-client privilege that defendant relies on for his argument—the Sixth Amendment right to counsel—"attaches and represents a critical stage only at or after the initiation of adversary judicial proceedings against the accused by way of a formal charge, preliminary hearing, indictment, information, or arraignment." *People v Anderson (After Remand)*, 446 Mich 392, 402; 521 NW2d 538 (1994). The Sixth Amendment right to counsel "is offense-specific and cannot be invoked once for all future prosecutions." *People v Smielewski*, 214 Mich App 55, 60; 542 NW2d 293 (1995). Given the parameters of the Sixth Amendment right to counsel, intrusion into the attorney-client privilege would not constitute a violation of the Sixth Amendment right to counsel unless that right to counsel had attached, and even then, the Sixth Amendment right to counsel is offense specific. See, e.g, *United States v Danielson*, 325 F3d 1054, 1066 (CA 9, 2003), as amended (May 19, 2003) ("The government's use of Sava to obtain Danielson's statements regarding separate offenses for which he had not been indicted . . . was not an impermissible intrusion into the attorney-client privilege and therefore, did not violate his Sixth Amendment rights.").

Defendant was arraigned in the district court on September 20, 2016, and at that time, he requested an attorney, thereby invoking his Sixth Amendment right for the charges involving Heeringa. See *Anderson (After Remand)*, 446 Mich at 402. However, the majority of the government conduct at issue occurred in August 2016 and on September 2, 2016, which was *before* defendant's Sixth Amendment rights for the current offense attached. Accordingly, the trial court did not err by rejecting defendant's Sixth Amendment claims relating to government conduct in August and September 2016.[8]

---

[8] Even setting aside the question of when defendant's Sixth Amendment right to counsel attached for the offenses involving Heeringa, defendant failed to show that (1) the government knowingly intruded into the attorney-client relationship and (2) that the intrusion prejudiced defendant or created a substantial threat of prejudice. *Singer*, 785 F2d at 234. Instead, the facts show that defendant treated the notes in his jumpsuit and the legal pad in his cell in such a careless manner as to negate his intent to keep them confidential. See *People v Compeau*, 244 Mich App 595, 597; 625 NW2d 120 (2001); see also *United States v DeFonte*, 441 F3d 92, 94-95 (CA 2, 2006). Further, defendant failed to show that the government knowingly intruded on the attorney-client relationship when, as a factual matter, the trial court determined the legal pad gave no indication its contents were confidential and the trial court rejected defendant's contentions that he told deputies the notes in his jumpsuit were for his lawyer. Additionally, defendant cannot show prejudice when the notes and legal pad in question were not used against him at trial, the items

The only action that occurred after defendant's Sixth Amendment right to counsel attached was the search of the confidential envelope in October 2016 by jail officials looking for information about deputies and their families amid security concerns that defendant was compiling information about deputies, their families, and where they lived. One deputy looked inside the envelope, and he did not share the information he saw with anyone else. In view of the legitimate justifications for opening the envelope, defendant cannot show that the government acted purposefully in order to garner confidential information. See *Steele*, 727 F2d at 585-586; *United States v Moses*, 337 Fed App'x 443, 449 (CA 6, 2009). Defendant also cannot show any prejudice when the deputy who opened the envelope in October 2016 was not involved with the investigation of defendant's crimes, he did not share the information he saw in the envelope with the investigators or the prosecutor, and he did not even recall the information that he saw in the envelope. In other words, the government, and in particular the prosecutor, did not obtain evidence, or information about the defense strategy, for use at trial against defendant or to use in any way to defendant's detriment. See *Steele*, 727 F2d at 585-586. Moreover, the trial court neutralized any potential taint caused by opening the envelope and assured that defendant would receive a fair trial with the effective assistance of counsel by ordering (1) that the materials in the envelope would not be admitted at trial, (2) that jail officials who viewed the materials were enjoined from relating the information to anyone, and (3) that the prosecutor was enjoined from receiving any such information. See *Singer*, 785 F2d at 234. On these facts, contrary to defendant's arguments, he was not entitled to dismissal of the charges in this case.

## VII. MOTION TO DISQUALIFY THE PROSECUTOR'S OFFICE

In his Standard 4 brief, defendant next contends that the trial court should have disqualified the Muskegon County Prosecutor's Office after his attorney, Brian Hosticka, accepted a position with the prosecutor's office.

Initially, we note that defendant abandoned his claim regarding disqualification of the prosecutor's office by failing to adequately brief the issue on appeal. In his brief, defendant mentions that "the acquisition of the defense's lead attorney Brian Hosticka by the prosecutor's office" and he characterizes Hosticka's decision to work for the prosecutor's office as "suspicious[]." But he fails to develop a meaningful argument supported by facts and law, and his cursory treatment of the issue constitutes abandonment. See *Matuszak*, 263 Mich App at 59.

In any event, defendant's assertion that the prosecutor's office should have been disqualified is without merit. "MRPC 1.9 prohibits an attorney from 'switching sides' by

---

were not given to the prosecutor, and, as found by the trial court, there is simply no indication that the prosecutor gleaned any new information or information about the defense strategy from the communications. See *Steele*, 727 F2d at 585-586; *United States v Dobson*, 626 Fed App'x 117, 125 (CA 6, 2015). And, with regard to the confidential envelope in particular, there were legitimate reasons for the search in September, the information was not shared with the prosecutor, and the trial court ordered safeguards to prevent the prosecutor from benefiting from the information in the envelope. See *Steele*, 727 F2d at 585-586.

representing a new client in a matter if the attorney's former client has an interest adverse to the new client." *People v Davenport*, 280 Mich App 464, 468; 760 NW2d 743 (2008) (*Davenport I*). "MRPC 1.10 governs the limitations imposed on an attorney's new firm with respect to representing parties whose interests are adverse to the new attorney's former clients," and "requires the new firm to undertake and disclose safeguards against improper communications." *Id*. at 469. As applied in the criminal context:

> A presumption of prejudice exists when a defendant's former defense counsel joins the prosecutor's office that is pursuing the case against the defendant. MRPC 1.9(b), 1.10(b). Such a presumption may be overcome, however, if the prosecutor shows that the attorney who has a conflict of interest was properly screened out from any participation in the matter. [*People v Davenport*, 483 Mich 906, 906 (2009) (*Davenport II*).]

If a defense attorney moves to the prosecutor's office, the trial court should be "promptly informed," and the trial court should then "inquire into the matter and order an appropriate safeguard, such as disqualifying the individual attorney affected by the conflict of interest, or the entire prosecutor's office, if necessary." *Davenport I*, 280 Mich App at 470. Relevant considerations include "the extent to which knowledge has been shared by the disqualified lawyer and the disqualified lawyer's role within the prosecutor's office." *In re Osborne*, 459 Mich 360, 369-370; 589 NW2d 763 (1999).

Defendant was at one point represented by Hosticka, both in this case and in the Bletsch proceedings. There is almost no information in the *current* record about why Hosticka stopped representing defendant. At most, during sentencing, defendant asserted that Hosticka "turned turncoat for money to the prosecutor's office" and that the trial court failed to "render a proper decision" after Hosticka's defection. It would constitute plain error, when alerted to an attorney's decision to "switch sides," to not conduct a hearing to determine whether disqualification of the prosecutor's office is necessary. See *Davenport I*, 280 Mich App at 471. However, as alluded to by defendant at sentencing, the trial court did render a decision on the issue of Hosticka and the prosecutor's potential disqualification in connection with the proceedings in Bletsch's case. Although the trial court's order, transcripts, and other pertinent documents from the Bletsch case do not appear in the lower court record, we may take judicial notice of these documents in the current case, particularly when there is no dispute about their accuracy. See *People v Parkmallory*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 342546); slip op at 2; *Johnson v Dep't of Natural Resources*, 310 Mich App 635, 649; 873 NW2d 842 (2015). Considering the trial court's order and other materials in the Bletsch case, it is clear that the trial court fulfilled its obligation to hold a hearing when confronted with an attorney's decision to switch sides. See *Davenport I*, 280 Mich App at 471. More substantively, the trial court did not err by refusing to disqualify the Muskegon County Prosecutor's Office after Hosticka left the defense to join the prosecutor's office. Although there may be a presumption that Hosticka's move to the prosecutor's office was prejudicial, see *Davenport II*, 483 Mich at 906, the prosecutor overcame this presumption with information about Hosticka's role in the office and efforts to screen out Hosticka from any participation in defendant's cases. See *In re Osborne*, 459 Mich at 369-370. On these facts, disqualification of the prosecutor's office was not warranted, and defendant is not entitled to relief on appeal. See *Davenport*, 483 Mich at 906; *Tesen*, 276 Mich App at 141.

-23-

## VIII. CUMULATIVE ERROR

Finally, defendant argues that the cumulative effect of the errors at trial warrants reversal. We disagree.

"The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted." *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007). To warrant reversal, errors must have been "of consequence." *People v Knapp*, 244 Mich App 361, 388; 624 NW2d 227 (2001). "In other words, the effect of the errors must have been seriously prejudicial in order to warrant a finding that defendant was denied a fair trial." *Id*.

The majority of defendant's claims of error—including his claims of jury partiality, his challenge to the search of his electronic devices, his arguments about the most substantial of the MRE 404(b) evidence, and the claims in his Standard 4 brief—are without merit. As discussed, defendant's only viable claims of error involve the admission of the homemade, voyeuristic videos and mention of the serial-killer list. However, given the strong evidence of defendant's guilt as detailed earlier, the cumulative effect of these relatively minor errors in the admission of other-acts evidence did not deny defendant a fair trial. See *id*. Accordingly, defendant is not entitled to reversal on the basis of cumulative error. See *id*.

Affirmed.

/s/ Patrick M. Meter
/s/ Colleen A. O'Brien
/s/ Jonathan Tukel